**In re Donald M. WITTE, Respondent.**

**No. 61379.**

Supreme Court of Missouri,
En Banc.

May 11, 1981.
Rehearing Denied June 8, 1981.

Merle Silverstein, St. Louis, for informant.

Roger M. Hibbits, St. Louis, for respondent.

WELLIVER, Judge.

This is a disciplinary proceeding originally instituted by the Bar Committee of the Twenty First Judicial Circuit against Donald M. Witte, a practicing attorney in St. Louis, Missouri. The Bar Committee found there was probable cause to believe that respondent was guilty of professional misconduct and caused an information to be issued charging respondent with making two settlements on behalf of his client Doris Duckett without her knowledge or consent, with commingling the proceeds of the two settlements with his own funds for his own use and benefit, and with forging or tracing of the client's signatures on settlement and release papers in both cases, all in violation of DRs 1–102(A)(1), (3), (4), (5), (6), 7–101(A)(2), (3), 7–102(A)(8), 9–102(A), 9–102(B)(1), (3), and (4) as contained in Rule 4. The Honorable Marshall Craig was appointed as a Special Master to hear evidence and make findings of fact, conclusions of law, and recommendations. The master found respondent guilty of professional misconduct but recommended only that respondent be given a public reprimand. In an attorney discipline case, it is our duty to review the case *de novo*, determining for ourselves the credibility, weight, and value of the evidence and all factual issues necessary for the decision. *In re Pine*, 576 S.W.2d 538, 539 (Mo. banc 1979); *In re Schiff*, 542 S.W.2d 771, 774 (Mo. banc 1976). We hold that respondent should be disbarred.

Mrs. Duckett is a widow, mother of nine, and a woman whose eyesight and hearing is failing and whose left side is partially paralyzed. On December 19 1970, Mrs. Duckett's husband was killed in an accident involving a bus operated by the Bi-State Development Agency (Bi-State). Respondent was employed by Mrs. Duckett on a contingent fee basis to recover against Bi-State for the wrongful death of her husband and during the course of the original employment was also employed to recover $1,000 double indemnity allegedly due from the Reliable Insurance Company (Reliable). Respondent also claims to have handled collateral matters for Mrs. Duckett during the course of these employments. The suits against Bi-State and Reliable were settled by respondent, the settlement in each case being in the amount of $750. Mrs. Duckett stated that she had never authorized either settlement, that she had not seen the settle-

ment papers in either case and that she had not signed releases or stipulations or endorsed drafts in either case, all of which was denied by respondent.

At the hearing before the master, a substantial part of the testimony was devoted to "trying" Doris Duckett. The master found "that from the time of the establishment of the client-attorney relationship, the respondent had a very difficult client. She was unpredictable, uncooperative, evasive and her health led to taking medication that affected her judgment and activities. Her testimony was vague, contradictory, confusing and lacked believability." The record shows that Mrs. Duckett was undergoing a variety of physical and emotional stresses during this period, and that she was taking several kinds of drugs, including large quantities of Valium. She testified that her reactions to some of the medications ranged from virtual unconsciousness to staggering and passing out; and, that if she was not medicated she became so "nervous" that she simply could not function.

The master found the testimony of the handwriting expert, William H. Storer, to be credible, and that the expert's testimony "as to tracing was especially impressive." The photographic transparencies or overlays of the signatures on the settlement checks prepared by the expert and presented to the Court as exhibits left little to the imagination of even the casual observer.

The testimony is undisputed that respondent deposited the proceeds of both settlements into his office or personal bank accounts, that his client's money was commingled with his own funds, and that he declared such sums less expenses incurred as his income for income tax purposes. The remainder of all funds in these accounts were withdrawn and used by respondent for his personal use. No part of the proceeds of the settlements were delivered to the client, Doris Duckett, until a member of her family asked attorney Littleton to call and inquire of respondent as to the status of the two cases.

The master apparently viewed respondent's sick and troubled client as the excuse

for his conduct. We view this testimony in a different light. For every degree that respondent by his testimony and evidence proved a less than normal mental and functional capacity on the part of his client, Doris Duckett, he raised by an equivalent degree the standard of conduct which this Court must require of him in his dealings with his client.

This Court has on two prior occasions held the commingling of client monies by a lawyer to be grounds for disbarment or suspension. In the case of *In re Robison*, 519 S.W.2d 1 (Mo. banc 1975), the client deposited $1200 with the lawyer to pay a claim. Instead of paying the claim, the lawyer commingled the funds with his own money and used the funds for his personal ends. We held disbarment an appropriate punishment. The case of *In re Houtchens*, 555 S.W.2d 24 (Mo. banc 1977) was based on several charges of commingling clients' funds. Count II, much like the instant case, involved a $4,000 settlement draft being delivered to the attorney who gave the company a release. Neither the release nor draft was signed by the client. The lawyer deposited the draft in his personal account. We stated, "Misconduct, such as that which respondent is charged, is totally incompatible with the ethical standards of the legal profession; and, absent some very persuasive and acceptable mitigating factor, disbarment is the proper answer." 555 S.W.2d at 26. The *Houtchens* court found the lawyer to be suffering from some psychological problems and considered this to be a mitigating factor justifying only a three year suspension rather than disbarment.

Other jurisdictions have made similar rulings on disciplinary matters. Ohio stated that the rule against commingling funds " 'was adopted to provide against the probability in some cases, the possibility in many cases, and the danger in all cases that such commingling will result in the loss of clients' money.' " *Columbus Bar Association v. Tuttle*, 41 Ohio St.2d 183, 184, 324 N.E.2d 753, 754 (1975), *quoting, Clark v. State Bar of California*, 39 Cal.2d 161, 168,

246 P.2d 1, 5 (1952). *See also Peck v. State Bar of California*, 217 Cal. 47, 51, 17 P.2d 112, 114 (1932).

In the case of *In re Fields*, 36 App.Div.2d 277, 319 N.Y.S.2d 993 (1st Dept. 1971), the lawyer was found to have commingled and converted a client's funds, settled a claim without the client's consent or knowledge and forged his client's name to a petition and other documents. The court held, "The respondent has been guilty of professional misconduct of the type which demonstrates his unfitness to continue as a member of the Bar." 36 App.Div. at 278, 319 N.Y.S.2d at 994. When that court was confronted with a lawyer who had commingled, used and converted trust funds, the court stated:

> Respondent's conduct reflects complete indifference to the responsibilities and obligations owed by a lawyer to clients, particularly in respect to trust funds. In mitigation, respondent pleaded . . . the illness of his wife and his unrealized expectation of receipt of funds to make good his defalcations. . . . He has demonstrated a lack of capacity to fulfill the duties of the office of attorney and counselor and merits the severest discipline.

*In re Poller*, 35 App.Div.2d 156, 157, 314 N.Y.S.2d 843, 844 (1st Dept. 1970).

■ The commingling of the client's funds is admitted, except for the explanation offered by respondent that he kept the funds at the request of the client, which she always denied, and his further explanation that he secured the client's funds by writing a notation and putting it in his safe with some commemorative coins, in which notation he stated that the coins should serve as security for what he owed Mrs. Duckett from the settlements. Our prior cases having recognized disbarment as an appropriate punishment for the commingling of clients' funds with those of the attorney, all that remains to be done is to examine the evidence to determine whether there are mitigating circumstances either justifying or explaining the conduct of respondent and warranting lesser punishment.

In this respect, we judge the matter primarily on the testimony of the respondent himself. Respondent's testimony for the most part is uninterrupted narrative, and does not lend itself to either paraphrasing or summary. It will therefore be necessary to set forth a considerable amount of respondent's testimony verbatim.

Respondent frequently refreshed his memory from his office files and records. These records were devoid of either time records to support and justify the amount of other work allegedly done for the client or copies of correspondence which would prove notice to the client of the settlements and also prove transmittal to the client of drafts, releases, and stipulations for her signature. Respondent explained that his time records were informally kept, periodically noted, probably on yellow pad sheets, and that most correspondence had been "culled" from the files at the time of closing.

With reference to the Bi-State settlement, respondent testified:

> He [the opposing lawyer] mailed me—correction. He either mailed me or I picked up the release and/or draft at the same time, and I am not sure about that, and I cannot recall how these documents were in fact signed. My normal office procedure is to immediately telephone the client and ask them to come into the office to sign, or if I mailed them to her with the return envelope back to me or if I went by her house and dropped them off or if, in fact, she signed them in front of me. I cannot recall. It's my recollection, however, that she knew of the settlement, she agreed of [sic] the settlement, and that the signing of the documents was handled in what I would call a normal routine of my office, and due to the small amount of this settlement, that is $750.00, possibly some of the formalities that I would normally use in a larger settlement were not used at that time. After the documents were signed, that is, the release and the draft from Bi-State, Mrs. Duckett advised me that she did not wish to have the proceeds paid out to her at that time.

By reconstructing from memory "other work allegedly done" and "time spent on work", respondent concluded that at the time he probably owed his client, Doris Duckett, $93.60. He also said that "in the Bi-State case, I got both releases and draft at the same time" and then continued:

At that time I also told her that I did not wish to keep these net proceeds in my escrow account and that I would place them in a different account in some other type of bookkeeping. I don't believe I explained to her exactly what I was going to do; however, what I in fact did was to cash the entire settlement draft and reissue a check from my escrow account to my business account in the amount of seven hundred dollars [$750]. At that time I executed by writing on legal paper what I would call a note evidencing an obligation to Doris Duckett, which I believe I in essence made a rough settlement statement, showing the starting of seven fifty, the deductions for the case itself, and the deductions for the collateral matters that I had performed services for, showing at that time—and this figure I am not aware—I can't say with certainty is correct. It is my reconstruction figure of $93.60. Not wishing to have to keep track of this money, I referred to the note that the collateral which was to be used to pay Mrs. Duckett in the event I was not around for some reason was a coin collection that I had purchased from the Franklin Mint, which were coins about the size of a silver dollar or slightly larger of a high quality silver which sold for approximately twenty dollars apiece of all of the presidents of which I believe there were thirty-two or thirty-three at that time. Further to evidence the fact that the money could be obtained from these coins without any great trouble, they were purchased initially between 1970 and 1973 with a guarantee by American Press, who sold these coins, that within five years of the final purchase they would immediately refund the total price of anybody asked for it, due to the rising price of silver at that time, so that in my opinion there was

more than enough collateral at any time to pay the amount actually due Doris Duckett.

With reference to the Bi-State settlement, respondent first testified he mailed the papers to Doris Duckett. When the exhibits showed that they had not been folded, he said that he probably had taken them by the client's house. Respondent's explanation of the lack of punch holes on these papers was because they were just shoved in the file at the time of closing.

Testifying regarding the Reliable Insurance Company case, respondent stated:

Once again I have no direct recollection, due to the amount of time involved since this thing happened, as to how this execution of these documents was actually performed; however, I am sure that as soon as the document came in, either I or my secretary telephoned Mrs. Duckett they were here and requested her to come and sign them, or they were mailed out or I would have taken them by her house, but I have no direct recollection as to how that was done. My only recollection is that she did agree. She was advised of the settlement. She agreed to the settlement, and when those documents were presented to me by either being mailed back or by my secretary, by my cursory looking at them, they looked to me as if they were the signatures of Doris Duckett, and I notarized the release itself. I signed the stipulation and I put the draft in for collection. That is on the Reliable case.

Once again Mrs. Duckett advised me that due to the continual problem she was having with Mrs. Scott, her sister, and her daughter, that she wished that I would keep the net that she was due from this settlement in addition to the prior settlement with Bi-State. After I deducted all of my fees and services on other matters, which would have been the neighborhood fight, which was three hours at forty dollars an hour or a hundred and twenty dollars, defending the declaratory judgment action, which I know I spent more than three hours, but

I have down here three hours at thirty-five dollars an hour or a hundred and five dollars, and she had also telephoned me about a problem with her basement, which I spent, I believe, four hours on for a hundred and forty dollars, so those were $365.00 in deductions for other matters. I deducted the court costs of sixty dollars and attorney's fees of three hundred for $360.00, making the net payable to her after all deductions of some $250.00, [$25] and adding that to the $93.60 or thereabout which I was holding, meant that I had $118.60 of her money which she wanted me to retain on her behalf, which I did unfortunately.

On cross and redirect examination, respondent also added the following:

Q   And did you then report that entire $750.00 as income on your income tax?

A   I would say that I did.

Q   Why did you not use your escrow account for that check as you did the previous check?

A   Well, it is one of those things, pragmatic use, the fact that she had already declared to me I could have all the money. I told her what I had done before and I set up a separate account for the money I owed her from Bi-State. I saw no reason to reissue a check back to myself.

Q   Did you put another note in the file as to how much you owed her out of the Reliable settlement?

A   No, because the original note had a remark that I would be able to subtract other services performed, and I looked upon it and put a note in the Reliable file that was about—whatever figure it was, twenty-five, was still due from that to pay off the encumbrance to Mrs. Duckett, so it was, call it, a book procedure.

Q   You did put a note in the Reliable file indicating that you owed her twenty-five dollars?

A   Right, I made up what I would call a—where are 17 and 18 [the settlement statements respondent prepared almost 2 years later when he paid Mrs. Duckett]—a rough settlement statement showing what was there, showing what I had done since the closing of the Bi-State file and roughly showing that she was due twenty-five dollars.

Q   And you put that in—

A   Reliable file.

Q   Reliable file, and did you note on there that that amount was secured by the coin collection also?

A   Yes, words to that effect, or I don't know if I said the coin collection, but was to be added to the note in the Bi-State file or words to that effect. I don't know which.

Q   And Mrs. Duckett never got a copy of this note that went into the Reliable file?

A   She did not.

Q   And she never got any bills for any of the amounts that you were charging against her?

A   She did not.

Respondent testified with reference to both settlements that his secretary used his form book to write letters sending out settlement papers. The form letters all said "sign by the red check marks." There were no red check marks on any of the releases or the draft. Respondent's explanation of this was that he guessed he probably hadn't used the form letters, but had just called her and stuffed them in an envelope—that "for the reason that due to the relationship I built up with Mrs. Duckett it is very—well, I could have just told her, 'Sign these things and send them back'." It is interesting to note that the interrogatories which were definitely mailed out for signature did have a "check mark" at the signature line.

The evidence showed that the Reliable settlement check was dated January 30th and deposited to respondent's general account February 1st. Respondent testified that it could have been mailed to him, or picked up by him, mailed to Mrs. Duckett and remailed by Mrs. Duckett, or brought

to the office by her, or taken or picked up at the house by him, all within the two day framework. This release was not dated but was notarized by respondent who did not know whether he saw it signed by Mrs. Duckett. The February bank statement on which this deposit was shown also showed an overdraft on the account on February 12th.

With reference to the telephone call from Attorney Littleton and subsequent settlement which respondent did make with Doris Duckett, the respondent stated:

He [Littleton] stated that the daughters had introduced him to Mrs. Duckett and that he had inquired into the status of her case, and at this stage he asked if he could call me or she asked him, and I am not sure at this point. In any case, he telephoned me and it is my recollection that I received a telephone memo message from my secretary, either being on another call or coming in and that message being there, and I returned the phone call without paying attention to the number. I don't know if in fact I called his office or I called Mrs. Duckett's home, but in any case, I was on the phone about five minutes at the most with him, at which time I advised him that the case was settled. He only inquired about the Bi-State case, and I advised him as to the amount of the settlement and why it was settled for that amount, that is, due to the liability, which I am sure he passed on to Mrs. Duckett at that time if he was at her home at that time or later passed it on. After getting off the phone with Mr. Littleton, I pondered the matter for a while and I would say maybe an hour or so later, later in the day, I telephoned Mrs. Duckett inquiring as to why Mr. Littleton was telephoning me, and she said that she was greatly embarrassed over this and she only talked to Mr. Littleton at the insistence of her daughter, and she did not want Mr. Littleton to handle the matter in any way or to call me, but that her daughter insisted. At that time I told Mrs. Duckett that I had to disburse these proceeds to her without any more delay so there was no problem

that these matters were resolved and resolved to her satisfaction and asked her to come to my office. She stated that she would come out to my office; however, I did not hear from her for a while, and I would say that between March 10 and March 13th I telephoned her upon getting back to the office from court and told her she should come out to my office. She stated that she could not, and I asked her if I could come to her home, at which time she said yes. At that time in my mind I had no real idea of how many dollars I was actually going to pay out to Mrs. Duckett. At this particular time I was in an extremely good financial situation since I just had settled three separate personal injury lawsuits. That was going to turn out to be my best personal injury settlement month. I had received a jury verdict on February 22 in the sum of $25,000.00, which the insurance company had agreed to pay. I had a settlement over an acceptance of a matter in Paris, Missouri, of $17,500.00, and I had a settlement in a disfigurement case for $15,-000.00. These were a total of $25,830.00 in fees on these three cases alone. In addition I had other, you might call it, income from my other general practice during that month which had been coming in, so that when I went to her house, I had the intention of waiving some or all of the fees that I had initially charged against her towards these settlements, and in effect, when I got to her house, I advised her that I had some, you might say, financial good luck, and that I was in fact going to waive all of the fees on collateral matters, and at that time began to draw up the settlement statements in front of her from blank legal pads, writing matters down in front of her and explaining each and every matter to her as it was written [exhibits 17 and 18]. I had in my mind paying her roughly eight hundred dollars, and I might say, juggled the figures to arrive at that amount, and in fact, I did not charge the court costs on one of the cases that I should have charged, I believe, on the Bi-State mat-

ter, so that I could come up with the dollars or in the area of eight hundred dollars. It appeared to me at that time that she understood everything that I wrote down, and it is my practice for a number of reasons to write these in with a carbon copy and to give the client a copy of it and explaining to them that this money is not taxable and to keep this settlement statement so that if IRS should ever ask where did this four hundred and five hundred ninety dollar check come from, she could substantiate that with them in the fact that it was not income. After filling out each one separately, I had her sign the first form, tearing off, if my recollection would be correct, and giving her a copy, and then filled out the second form. At this time I cannot actually recall filling out either the Bi-State first or the Reliance Life Insurance Company settlement statement first. However, in any instance, there was never any question by Mrs. Duckett at this time as to, first, where did this Reliance Life Insurance Company case come from; second of all, I never signed any releases, drafts, stipulations, because this woman was fully aware and knowledgeable of the fact of all the matters that I have previously testified to concerning these matters. It is my recollection and I went back to my office and dictated the settlement checks and that they were prepared in the normal routine of dictation. However, one of them—and I don't know for what reason—seemed to be wrong, so I tore it up, but I sent the first one out immediately. I don't know why, if I did not redictate the second check, but about a week went by and I came across the file again and I immediately, without dictating on it, wrote the Reliable check for three ninety-five in longhand and immediately mailed it to her, and I would say these were mailed out not later than the date on each one of the checks. Upon receiving my bank statement around the 5th of April, I noticed that neither one of these two checks had been cashed. I was fully aware that the neighborhood in which Mrs. Duckett

lives has a high crime rate, and due to the fact that she told me she had lost money previously to her sister, who had taken some of her checks from her, I wrote to her a letter on April 9, 1976, which was on a Thursday, asking if she had received those checks. I don't seem to be able to find that. I know . we had that at one time. My letter of April 9 [apparently the only letter not culled] to Mrs. Duckett read: On March 11, 1976, and March 18, 1976, I mailed two separate checks to your above address. Neither of these checks have been presented to my bank as of this date. Paragraph. If you have not received these checks, will you kindly contact me immediately or advise me as to why they have not been presented? Best wishes to you and your family, Very sincerely yours. On Tuesday, April 13th, 1976, Mrs. Duckett telephoned me at 11:10 a. m., according to a legal memo pad note that I made to myself on most telephone conversations [the only telephone note produced] that I received from clients. I filled it out at that time. She started off by complaining of problems, bone disease, nerves, seizures, hearing, no feeling of hot or cold, two heart attacks, cataracts on the eyes, high blood pressure, glaucoma clinic. Then told me about the man who had attacked her had gone to trial and he was to get life for robbery, assault with intent to kill. She stated she got the two checks but hasn't been able to get to the bank at Manufacturer's Bank.

The two settlement sheets (yellow pad sheets, exhibits 17 and 18) were undated, partially written in ink and part in ball point pen, raising at least a possible inference that they were not written at the same time.

The checks sent to Mrs. Duckett were two weeks apart. The Bi-State settlement check was typed, the Reliable settlement check was hand written. This was explained,

A I thought I stated that in my statement yesterday is that normally checks are typed up and I dictated

those checks and somehow—I forgot which one right now—the one that was typed was typed from the typing and the other one was typed but it was in error somehow, and I tore it up and threw it away. I immediately sent her the one that was typed. I don't know if I redictated it and it didn't get typed. I realized, going through your files as you do, that there was something that hadn't been done on that file, and I immediately handwrote the second check and put it in the mail at that time.

Q Why didn't you just do the second check and send them both at the same time?

A Mr. Silverstein, we are creatures of habit. I like to do things in what I will call a neat manner. I just didn't do it. I would have preferred that the second check would have been typed also and it is not. I put it off. I sent the first check out and probably intended the second check, didn't get around to it and didn't get around to it and finally I wrote it out and sent it to her.

Q Wouldn't it have been neater to have sent both checks at the same time?

A I agree with you, sir. The only thing I can say: there was no pressure on me at that time to get the checks out at that time.

In explanation of his general conduct in this matter, respondent stated:

but at all time doing things in a way that I always thought was right, doing things at time without following what we call the formalized procedures to make sure that you don't protect yourself against someone in the future. I believe that in this matter I did not follow the procedures that I probably should have taken. I believe in retrospect that my act was one of stupidity, that I over trusted a client, that I became too familiar, too close, and acted in what I will call almost a family matter without formality, rather than following all the formalities that should normally be required in a law office.

Mrs. Duckett denied that she had either seen or signed releases, stipulations or drafts. During the course of the hearing and on cross examination Mrs. Duckett said that two signatures, according to the expert traced or forged, "looked like her signature" or appeared to be her signature. Respondent denied that any of the signatures were forged or traced. No counter expert was called by respondent. Respondent relied solely on his own testimony to dispute the tracing and forgery charges. There was no physical, objective, or corroborative evidence of transmittal of settlement papers and drafts to the client, Doris Duckett. There is no disagreement regarding the thoroughness of the expert and the very impressive nature of his testimony. The photographic transparencies of the signatures prepared by the expert so that they could be overlayed for the purposes of examination are consistent with Mrs. Duckett's testimony that she neither authorized the settlements or signed the settlement papers. Usually, when the conduct charged against the lawyer is of such nature that it can be violative of both our Code of Professional Ethics and the statutes of the state of Missouri, § 570.090, RSMo 1978 (Forgery), the disciplinary action comes to us only after full disposition of the criminal aspects of the case in the courts.

On the basis of our review of respondent's explanation of his conduct, we are unable to find mitigating circumstances which justify lesser punishment. To the contrary, respondent's explanation of his conduct is fraught with shifting positions and inconsistencies.

Having found respondent guilty of commingling the funds of his client and that disbarment is the appropriate punishment, *In re Houtchens*, 555 S.W.2d 24 (Mo. banc 1977); *In re Robinson*, 519 S.W.2d 1 (Mo. banc 1975), we find it unnecessary that we make formal findings on the charge of forgery and tracing of the signatures on the settlement papers and drafts. Respondent has violated Supreme Court Rule 4, DR 1–102(A)(1), (5), 9–102(A), 9–102(B)(1), (3) and (4).

Respondent is ordered disbarred.

DONNELLY and HIGGINS, JJ., concur.

SEILER, J., concurs in result.

MORGAN, J., concurs in part and dissents in part in separate opinion filed.

BARDGETT, C. J., and WELBORN, Special Judge, concur in opinion concurring in part and dissenting in part of MORGAN, J.

RENDLEN, J., not sitting.

MORGAN, Judge, concurring in part and dissenting in part.

I agree that the record reflects that respondent, by negligence or otherwise, is guilty of "commingling" approximately $120 of his client's funds with those of his own; and, that for so doing, he has violated certain Disciplinary Rules and should be disciplined.

However, I respectfully suggest that the outright disbarment ordered in the principal opinion is exceedingly harsh and not mandated by the facts of this case. As pointed out therein, we do in a disciplinary case reserve unto ourselves the power to review the same *de novo* and limit the findings of the Master to recommendations only. Nevertheless, we should not disregard the same unless found to be totally erroneous. In this case, it was recommended that "respondent be given a public reprimand."

We note certain conclusions of the Master upon which his recommendation, heretofore noted, was based. (1) That respondent had a reputation as "a man of good moral character, trustworthy, honest and [his reputation] for truth and veracity was excellent." (2) That "it is clear that from the time of the establishment of the client-attorney relationship, the respondent had a very difficult client. She was unpredictable, uncooperative, evasive and her health led to taking medication that affected her judgment and activities. Her testimony was vague, contradictory, confusing and lacked believability. She failed to disclose all facts and circumstances." (3) "The evidence in this case is not substantial with reference to the testimony of the complaining witness. Without taking anything from the good faith and excellent work of the expert on questionable documents, his testimony is subject to careful scrutiny. His testimony is in direct conflict with the testimony of the respondent and in some instances is in conflict with the testimony of Doris Duckett." (4) "From all the evidence, it is concluded that the respondent did keep Doris Duckett informed as to his actions and had her consent to make the settlements which were made. He acted very unwisely in not keeping better records and in not making settlements with her as to the settled claims. His office procedures in this case were not good. He appeared to be meticulous in most of his office work, but lax in other steps taken." (5) ". . . it appears that the conduct of the respondent was an isolated case. There is no showing of a line of misconduct by the respondent. His reputation appears to be excellent."

In the case of *In re O'Brien*, 478 S.W.2d 310, 312 (Mo. banc 1972), we said: "Undoubtedly there do remain instances where some compassion is called for—even to members of the legal profession."

If the reprimand suggested by the Master is not adequate, undoubtedly a suspension limited to one year would be.