In re John J. CHARRON, Respondent.

No. 77352.

Supreme Court of Missouri,
En Banc.

March 26, 1996.

John E. Howe, Chief Disciplinary Counsel, Jefferson City, Maia Brodie, Clayton.

John J. Charron, Webster Groves, for respondent.

## ORIGINAL DISCIPLINARY PROCEEDING

LIMBAUGH, Judge.

This is an original disciplinary proceeding filed in two counts. The Chief Disciplinary Counsel charges Respondent, John J. Charron, with numerous violations of the rules of professional conduct in relation to 1) his representation of the Industrial Development Authority of the City of Berkeley (IDA) and 2) his performance as personal representative of the estate of Craig Layton and as trustee of a revocable trust established by Craig Layton. The Honorable Carol Kennedy Bader was appointed special master and, after hearing, recommended that Respondent be disbarred.

■ In a disciplinary proceeding, the master's findings of fact, conclusions of law, and recommendation are advisory. *In re Oberhellmann*, 873 S.W.2d 851, 852–53 (Mo. banc 1994). This Court reviews the evidence *de novo*, determines independently all issues pertaining to credibility of witnesses and the weight of the evidence, and draws its own conclusions of law. *Id.*

### I.

■ On March 31, 1992, IDA terminated Respondent as its counsel and requested the return of IDA's official seal and all documents, papers, files, and minutes belonging to IDA in Respondent's possession. A follow-up letter was sent by IDA on April 2, 1992, repeating the request. For months thereafter, IDA and Respondent engaged in an ongoing dialogue about the return of IDA's property, but the matter was still not resolved. Finally, on May 27, 1992, IDA filed a formal complaint with the Chief Disciplinary Counsel. On October 13, 1993, a year and seven months after the original request, Respondent returned the property.

Rule 4–1.15(b) requires an attorney to promptly turn over any property the client has a right to receive. Respondent does not dispute the underlying factual basis of the charge against him, and he concedes that IDA had a right to the files. In his defense, Respondent makes two points. First, he contends that IDA was not harmed by the failure to promptly return the property because IDA had duplicates of everything in its own files. However, the fact that the client does not suffer harm does not acquit Respondent of violating the rule. *See In Matter of Miller*, 568 S.W.2d 246, 252–53 (Mo. banc 1978) (interpreting DR9–102, the predecessor to Rule 4–1.15). For his second point, Respondent argues that he returned the files as soon as possible. Any delay, he explains, was a result of numerous changes in personnel at his law firm during the time period that IDA was attempting to recover their files. Even if we accept Respondent's contention, the amount of time it took for Respondent to return the files to IDA—a year and seven months—is not prompt and is better explained by Respondent's own negligence in handling the matter. Therefore, we conclude that Respondent violated Rule 4–1.15(b).

### II.

#### A.

Craig Layton owned and operated Barrett's Florist, Inc. For a number of years, Respondent had performed legal services for Barrett's Florist. In exchange for this representation, Respondent accepted a $20,000 promissory note guaranteed by Craig Layton. In May of 1990, Craig Layton died of AIDS.

Thereafter, in accordance with Layton's will, Respondent became the personal representative of Layton's estate. Prior to that time, Respondent had never been a personal representative of an estate and had little experience in probate matters. Soon after the estate was opened, Respondent paid himself from the estate the $20,000 owed on the promissory note. In making this payment, however, Respondent failed to file a claim against the estate, nor did he apply for appointment of an administrator *ad litem* as required under § 473.423, RSMo 1986, when the personal representative is also a creditor of the estate. Furthermore, while acting as personal representative, Respondent made payments to himself totaling $9,500 for legal services rendered to the estate. These pay-

ments were also made without approval of the court.

In October of 1992, the probate division ordered Respondent to appear and to show cause why no annual settlement had been filed. When Respondent failed to appear on the appointed date, he was removed as the personal representative. Over the next few months, the probate division set seventeen different dates for Respondent to provide a "settlement to revocation," a settlement to the date of his removal. § 473.603, RSMo 1986. Respondent failed to appear on three of those dates, and on several occasions when he did appear, he failed to provide complete information.

Once the settlement was finally completed and filed, Respondent was ordered to show cause why he should not be surcharged for the payments he made to himself. In response, he filed a counter-motion to ratify the payments. The probate division disallowed the $20,000 payment on the promissory note because no claim had been filed against the estate. Of the $9,500 Respondent paid himself in attorney's fees, the probate division approved only $6,000, the maximum allowed under the probate fee statute, § 473.153, RSMo 1986. Finally, the probate division found that Respondent had distributed $2,965 worth of furniture to family members without vouchers being filed to document the distribution, and that the settlement to revocation reported a shortage of $403.55. Therefore, the probate division ordered Respondent to repay to the estate all of the above amounts plus interest on the excess attorney's fees and the promissory note. The total amount was $29,408.55.

### B.

Craig Layton's estate plan also included a pour-over trust in which Respondent was named trustee. At the time Respondent began administration of the trust, it contained a condominium, Layton's florist business, and $200,000. For his services as trustee and as lawyer for the trust, Respondent paid himself $70,000 in fees. After two years as trustee, Respondent voluntarily turned over the trust to a successor trustee. By then, the trust contained only $409, the condominium, and the florist business, which was on the verge of bankruptcy.

It was Mr. Layton's wish, as explained in the trust, that the florist business be sold to its employees. The employees, however, were unable to purchase the business, and the record is unclear whether other buyers were available. In any event, Respondent continued to operate the business despite the fact that it showed a $21,000 operating loss for 1991 and had liabilities of over $200,000. Of those liabilities, approximately $150,000 were taxes owed to either the United States or the State of Missouri. The recession of the early '90s, according to Respondent, was the cause of the operating loss, and prior to that time, he noted, the business had done quite well. Respondent testified that he continued the business because he felt that the recession would not last long, and that the business was potentially successful. Further, he believed that the business could eventually be sold for a substantial price of $250,000 to $400,000. Nevertheless, after Respondent removed himself as trustee, the florist business was placed into bankruptcy by the successor trustee.

Craig Layton's condominium was also part of the trust. The condominium had two outstanding notes against it totaling $80,000, each secured by a deed of trust on the property. Respondent testified to his belief that the condominium had a value of $100,000 to $125,000. Although Respondent claims to have made diligent efforts to sell the condominium, he was unable to do so. According to the successor trustee, who was a member of Layton's family, at least one buyer had in fact been available, but inexplicably Respondent had told the realtor that the family was unable to agree on a price. Respondent blames the recession and the fact that prospective buyers may have been aware that Layton died of AIDS for his failure to sell the property. At some point during his trusteeship, Respondent apparently stopped making the mortgage payments, and after the successor trustee took over, the banks foreclosed.

### C.

Rule 4–1.1 requires an attorney to render competent representation. Rule 4–

1.3 requires an attorney to act with reasonable diligence and promptness in representing a client. Rule 4–3.4(c) states that an attorney shall not knowingly disobey an obligation of a tribunal. Respondent violated Rules 4–1.1, 4–1.3 and 4–3.4(c) by failing to file an annual settlement in the probate estate and by failing to complete the settlement to revocation for 14 months despite the probate division's insistence. Further, Respondent violated Rule 4–1.1 by failing to file settlement vouchers when he made distributions from the estate and by failing to seek court approval before paying himself attorney's fees that exceeded the statutory allowance.

■ Rule 4–1.7(b) forbids an attorney from representing a client if that representation will be materially limited by the attorney's own interest. Respondent had a conflict of interest by the fact that he was both a creditor of the estate and the personal representative of the estate. To alleviate such conflicts of interest, § 473.423, RSMo 1986, mandated that Respondent obtain the appointment of an administrator *ad litem.* Respondent failed to follow this procedure, thereby placing his own interest in receiving the funds above the interest of the estate in assuring that the claim was proper. Furthermore, Respondent had no right to the payment of the promissory note because he failed to file a claim against the estate. Although it appears that he had a legitimate claim for the funds, making payment without perfecting the claim amounts to misappropriation.

■ Rule 4–1.5 requires an attorney's fee to be reasonable. Under the rule, factors to be taken into account in determining the reasonableness of fees include the amount of time involved and the results obtained. Respondent violated Rule 4–1.5 by taking attorney's fees from the probate estate that exceeded by $3,500 the amount eventually approved by the probate division.

■ Regarding the trust estate, Respondent failed to sell either the condominium, which was eventually foreclosed upon, or the florist business, which was eventually put into bankruptcy, in the two years he was

trustee. Moreover, when the trust was turned over to the successor trustee, it contained only $409 in cash, down from the $200,000 as of the date of Layton's death. Respondent took approximately $70,000 in attorney's fees and trustee's fees from the trust, justifying the amount in large part because of his attempts to settle the tax debts of the florist business. At some point, Respondent should have recognized that his efforts were not justified. Respondent admitted as much when he testified that the trust assets "got eaten up" by his efforts to run the business, sell the condominium, and reduce the tax liabilities. In view of the abject failure to effectively manage the trust, we conclude that the amount of attorney's fees was unreasonable.

■ We do not determine, however, that Respondent's service as trustee was necessarily incompetent in violation of Rule 4–1.1. Clearly, in hindsight, he made several bad business decisions, but that is the extent of the proof. The Chief Disciplinary Counsel claims that other buyers existed for the condominium and the florist. However, the only evidence presented was 1) testimony from the successor trustee that a realtor had told him that a buyer for the condo existed and 2) the unsubstantiated conclusion that buyers existed for the florist business.

■ In his defense, Respondent argues that all the rule violations were caused by his depression, the disorganization of his office, and the loss of several office personnel. In our view, these arguments serve to mitigate punishment, perhaps, but not guilt. We note, too, that Respondent only began seeking help for his depression after the institution of this disciplinary proceeding.

### III.

■ Having determined that Respondent has committed numerous violations of the rules, the only remaining issue is the sanction to be levied. In this regard, we note that the fundamental purpose of a disciplinary proceeding is to "protect the public and maintain the integrity of the legal profession." *In re Waldron,* 790 S.W.2d 456, 457 (Mo. banc 1990).

We also take into account that in 1988, Respondent was the subject of a disciplinary action in which he received a private reprimand. In that action, it was determined that Respondent violated the Rules of Professional Conduct by neglecting a legal matter entrusted to him and by failing to inform his client of the status of the matter.

In this case, the most serious charge against Respondent is the misappropriation of $20,000 from the probate estate. Misappropriation of funds generally warrants disbarment. *See e.g., In re Griffey,* 873 S.W.2d 600, 603 (Mo. banc 1994); *In re Schaeffer,* 824 S.W.2d 1, 5 (Mo. banc 1992); *Matter of Mendell,* 693 S.W.2d 76, 78 (Mo. banc 1985). Moreover, even unintentional misappropriation of funds can warrant disbarment. *Matter of Williams,* 711 S.W.2d 518, 521–22 (Mo. banc 1986). Here, however, we are presented with a factor not found in previous misappropriation cases—that Respondent was truly owed the money. While this does not excuse the misappropriation, it does act in mitigation. Further, no evidence was presented that the estate was unable to pay the other creditors, and had Respondent followed proper probate procedures in filing his claim he would have received the money owed to him anyway. All in all, we do not believe that disbarment is warranted in this case, even when the misappropriation is coupled with the other violations both in this case and the 1988 case. On the other hand, a public reprimand is certainly insufficient. Therefore, we order that Respondent be suspended from the practice of law with leave to apply for reinstatement in one year.

It is so ordered.

HOLSTEIN, C.J., and PRICE and WHITE, JJ., concur.

ROBERTSON, J., concurs in part and dissents in part in separate opinion filed.

COVINGTON, J., concurs in opinion of ROBERTSON, J.

BENTON, J., not sitting.

ROBERTSON, Judge, concurring in part and dissenting in part.

I agree that John Charron violated the Rules of Professional Conduct as set out in the Court's opinion. I respectfully dissent, however, from the sanction the Court imposes.

This is a case in which an attorney took advantage of his position as the personal representative of an estate to recover funds due him under a promissory note from the decedent. He did so without the approval of the probate division. He did so despite the clear requirement under section 473.423 that he file a claim. He did so to assure himself of payment in full of his claim, without regard to the statutory priority of other claims to the estate's assets, section 473.397, RSMo 1986, and without regard to the rights of other potential claimants to the estate's assets to share fully in those assets. He did so in such a manner that one could reasonably conclude that he attempted to hide what he had done from the probate division.

Moreover, this is a case in which an attorney, who failed to carry out the directives of the trust, failed to preserve the trust assets and failed to meet the financial obligations of the florist business, took as fees nearly one-third of the liquid assets of a trust. When Mr. Charron's work was finally completed, all that remained were debts and bankruptcy—except as to Mr. Charron, who had taken $70,000 in fees away for "professional services rendered."

These seem to me to be the kind of breaches of professional conduct which warrant disbarment. *In re Mentrup,* 665 S.W.2d 324, 325 (Mo. banc 1984); *In the Matter of Mendell,* 693 S.W.2d 76, 77–78 (Mo. banc 1985). Unlike the majority, I do not find the fact that the decedent owed Mr. Charron the money a matter of mitigation. Indeed, the fact that he was willing to put himself ahead of all other creditors and his willingness to shield that act from the eyes of the probate division seems every bit as worthy of disbarment as stealing a client's funds. In both instances, it is the fiduciary's position as a lawyer that permits him to put his interests

ahead of all others and to attempt to hide his unethical act through subterfuge and delay.

I would disbar Mr. Charron.