**In re Mark BELZ, Respondent.**

**No. SC 88985.**

Supreme Court of Missouri,
En Banc.

July 15, 2008.

Sam S. Phillips, Alan D. Pratzel, Office of Chief Disciplinary Counsel, Jefferson City, MO, for INF.

R.C. Wuestling, M. Adina Johnson, Eric O. Wolfgram, Wuestling & James, L.C., St. Louis, MO, Ann K. Covington, Bryan Cave, L.L.P., Jefferson City, MO, for Respondent.

LAURA DENVIR STITH, Chief Justice.

Both Mr. Belz and the Office of Chief Disciplinary Counsel (OCDC) agree that Mr. Belz committed professional misconduct when he borrowed his client's trust account funds without permission over a four-year period. The parties also agree that Mr. Belz kept a clear record of the amounts he had borrowed, then voluntarily repaid the sums to the accounts and self-reported his misconduct to the OCDC. The disciplinary hearing panel found that Mr. Belz's conduct resulted from his bipolar disorder, which caused manic behavior on his part and which has now been successfully treated by a physician. OCDC contends that these mitigating factors—self-reporting, mental illness, record keeping, and voluntarily restitution—are not relevant in cases of misappropriation and that disbarment is the correct sanction. This Court disagrees.

Although disbarment is the usual result in misappropriation cases because of the egregious nature of the misconduct, consistent with this Court's approach in prior cases and the ABA's *Standards for Imposing Lawyer Sanctions* (1991 ed.) ("ABA Standards"), this Court holds that mitigating factors are always considered in determining the correct sanction and that even in misappropriation cases exceptional mitigating factors may warrant a sanction other than disbarment. Mr. Belz's self-reporting, his voluntary restitution, his keeping of a record of his borrowings, and his mental illness present just such exceptional mitigating factors. Mr. Belz's license is suspended with no leave to apply for reinstatement for three years.

## I. FACTUAL BACKGROUND

Mark Belz has been admitted to practice in Missouri since 1976. From 1999 to early 2003, he was managing partner and

sole shareholder of Belz & Jones, P.C., a Missouri law firm located in Clayton. Mr. Belz suffers from bipolar disorder, which was first diagnosed after he experienced a manic episode in 1975 for which he was treated by Dr. Eugene Holemon, a board-certified psychiatrist. Bipolar disorder is a genetically based mood disorder that causes radical emotional swings, from manic highs to depressive lows. Manic and depressive periods can cycle rapidly or can last for lengthy periods. The disorder is often treatable or controllable by medication. Dr. Holemon was able to successfully treat Mr. Belz, and his manic behavior disappeared. Beginning in 1981, Dr. Holemon believed that Mr. Belz no longer required medication, and it was discontinued.

The record shows that Mr. Belz was free of symptoms of his bipolar disorder from 1981 through 1998 and developed an excellent record as an attorney during that period. During that same period, Mr. Belz was extensively involved in his community and became an elder of the Presbyterian Church of America. In the course of his practice, he created revocable living trusts for Bert and his wife Mildred.[1] Once Mildred died, Mr. Belz became trustee of Bert's trust.

In 1998, while on a vacation to Europe, Mr. Belz began to drink. Shortly thereafter, he again began experiencing manic episodes, characterized by grandiose feelings, mood swings, and conduct that is typical of the manic phase of bipolar disorder. This manic period lasted, according to Dr. Holemon, from 1998 until it was successfully treated by a resumption of medication in 2003. During this period, Mr. Belz made unauthorized withdrawals from Bert's trust account that he used for

mortgage payments and to meet firm expenses. He meticulously recorded each withdrawal and noted that he owed the money to the account. In 1999 and 2000, he paid back the borrowed sums within a few months. After March 2000, he continued to make entries showing that he had withdrawn the monies and that he owed them to the trust account, but he did not promptly repay the sums.

In December 2002, Mr. Belz became seriously ill and believed he might die. He became concerned about the borrowed monies and, for the first time, informed his son and his law partners about the funds he had withdrawn. Mr. Belz and his law partners discussed the need to report the misconduct and repay the amount of funds then outstanding. Mr. Belz acknowledged the need to report his misconduct and accepted the responsibility of self-reporting the conduct to OCDC. After repaying all funds with interest on March 14, 2003, Mr. Belz filed a report of his conduct with the OCDC on May 1, 2003. Mr. Belz also provided full disclosure of his conduct to his affected clients. Mr. Belz began seeing Dr. Holemon again for treatment in May 2003, and he resumed a course of medication to treat his bipolar disorder. Mr. Belz continues to receive treatment from Dr. Holemon to the present day.

After an evidentiary hearing, the disciplinary hearing panel found that Mr. Belz was guilty of violating Rule 4–8.4(c) by engaging in conduct involving dishonesty, deceit and misrepresentation as well as conduct that is prejudicial to the administration of justice in violation of Rule 4–8.4(d). The panel also concluded that Mr. Belz violated Rule 4–1.15(a) by failing to hold his client's property separately from

---

1. In order to protect their privacy, these clients are referred to by their first names only.

his own. It concluded that various aggravating circumstances were present, including dishonest or selfish motive, multiple offenses, vulnerability of the victim and substantial experience in the practice of law.

The panel found important mitigating circumstances as well, including that Mr. Belz had in good faith given timely restitution of the funds taken. It also stated in its findings of fact that he had self-reported. With regard to bipolar disorder, the panel noted that ABA Standards allow that mental disability can be a mitigating factor when certain specified conditions are met, including that the misconduct is unlikely to recur. *See* ABA Standards 9.32(i). The panel found that Mr. Belz "exhibited symptoms of unusual spending, grandiosity, lack of judgment and inability to appreciate the consequences of his actions" during his manic period from 1998 to 2002, which led to his misconduct. The panel also concluded that Mr. Belz "has recovered from the manic state he suffered and his recovery has been demonstrated by a meaningful and sustained period of successful rehabilitation and treatment" but it was "not convinced that Respondent's recovery has arrested the misconduct and that recurrence is unlikely." Therefore, the panel concluded that Mr. Belz's mental disability should not be considered a mitigating factor. Absent this factor, it found, disbarment was the appropriate sanction.

## II. STANDARD OF REVIEW

The findings of fact and conclusions of law of the disciplinary hearing panel are advisory. *In re Cupples*, 979 S.W.2d 932, 933 (Mo. banc 1998). "This Court [in a disciplinary proceeding] reviews the evidence *de novo*, independently determining all issues pertaining to credibility of witnesses and the weight of the evidence, and draws its own conclusions of

law." *In re Snyder*, 35 S.W.3d 380 (Mo. banc 2000); *see also In re Oberhellmann*, 873 S.W.2d 851, 852–53 (Mo. banc 1994).

## III. DISCUSSION

The OCDC, the disciplinary hearing panel and Mr. Belz all agree that his misappropriation of client funds is misconduct that violates Rules 4–8.4(c) and (d) and Rule 4–1.15(a) and that he should be subject to discipline. They disagree as to what discipline is appropriate.

### A. General Factors Governing Discipline

OCDC argues that the only possible discipline for a misappropriation of client funds is disbarment. Mr. Belz accepts that disbarment is the appropriate baseline standard for cases involving misappropriation of funds, but he argues that in this case numerous mitigating factors are present that counsel for a less severe punishment, including his bipolar disorder and his subsequent meaningful recovery, his self-reporting of his violations, his record-keeping with regard to the monies misappropriated, his restitution prior to reporting or any investigation, his remorse, the lack of actual harm to his clients who have remained his clients even after learning of his conduct, his present medical treatment and his recognition that he will need to continue to take medication. He contends that a stayed suspension with probation would be appropriate under these facts.

Both OCDC and Mr. Belz rely on the ABA Standards to support their positions, which is appropriate under this Court's precedents. *See, e.g., In re Crews*, 159 S.W.3d 355, 360–61 (Mo. banc 2005) (reciting ABA Standards and noting that the Court considers the ABA Standards "when determining what level of discipline to impose"); *In re Griffey*, 873 S.W.2d 600, 603 (Mo. banc 1994) (noting adherence to ABA Standards in disbarment case).

It is to the ABA Standards that this Court now turns. ABA Standard 3.0 states that courts should consider four primary factors when imposing sanctions after a finding that a lawyer has committed professional misconduct:

(a) the duty violated;

(b) the lawyer's mental state;

(c) the potential or actual injury caused by the lawyer's misconduct; and

(d) the existence of aggravating or mitigating factors.

These four factors in Standard 3.0 provide the basic framework for all disciplinary matters, while the remaining standards provide guidance as to appropriate sanctions for specific types of misconduct.

Standard 4.1 offers guidance when lawyers fail to preserve their client's property, as Mr. Belz has done here. It provides that *"[a]bsent aggravating or mitigating circumstances,* upon application of the factors set out in Standard 3.0 ... disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client."  ABA Standards 4.11 (emphasis added).[2]  This, OCDC notes, is the baseline sanction for such misconduct. Mitigating factors, such as mental illness, do not constitute a defense to a finding that such misconduct occurred, but rather constitute "considerations or factors that may justify a reduction in the degree of discipline to be imposed." ABA Standards 9.31 (defining mitigating circumstances).

*B. Mitigating and Aggravating Factors are Considered in Every Disciplinary Case, Including Intentional Misappropriation Cases*

Despite acknowledging that this Court's precedents and the ABA Standards recognize that mental illness and other matters are appropriately considered in determining whether the sanction of disbarment should be mitigated and that Missouri normally is guided by the ABA Standards in matters of discipline, *see, e.g., Crews,* 159 S.W.3d at 360–61, OCDC argues that, in cases where attorneys have misappropriated client funds, Missouri has rejected the ABA Standards in favor of an unwritten, hard and fast rule that attorneys who misappropriate client funds will be disbarred in all cases without regard to any of the mitigating circumstances relevant under Standard 4.11, citing *In re Mendell,* 693 S.W.2d 76 (Mo. banc 1985).

◼  While misappropriation of client funds is one of the most serious types of attorney misconduct, OCDC is incorrect that Missouri adheres to an automatic disbarment rule in these cases. Disbarment is most often appropriate in misappropriation cases, but this Court will nonetheless consider the presence of aggravating and mitigating factors in each case when assessing the appropriate punishment.

*Mendell* certainly did not hold otherwise. *Mendell* involved a young lawyer who received an $8,000 settlement check for his client (a widow), but then lied to her that the settlement amount was only $7,500 so that he could keep the entire $500 difference rather than the $133 share of that $500 that should have been his under his fee agreement. As his client and her son became suspicious about the settlement amount, he continued to mislead and deceive them willfully. His later attempts to explain his misconduct, offered only after his deception had been revealed, were not accepted. Moreover, he only offered restitution to his client after he had

---

**2.** The ABA guideline recommends suspension "when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." ABA Standard 4.12.

been caught. In such circumstances, although the amount involved was small, this Court held:

> The violation was willful, deliberate and inexcusable. We follow our recent cases holding that an appropriate remedy for willful conversion or misappropriation of client's funds is disbarment. *In re Witte,* 615 S.W.2d 421 (Mo. banc 1981); *In re Mentrup,* 665 S.W.2d 324 (Mo. banc 1984). *See also In re Maier,* 664 S.W.2d 1 (Mo. banc 1984). Our conclusion is consistent with the great weight of authority. (*footnote omitted*) Any earlier decisions indicating that a lesser sanction might be considered in cases such as this are no longer authoritative.

*Mendell,* 693 S.W.2d at 78. OCDC interprets this passage of *Mendell* as establishing a rule that no circumstances can justify a lesser punishment than disbarment in misappropriation cases. This is not a correct interpretation of *Mendell.*

Nothing in *Mendell* suggests that this Court intended to reject those prior cases that had clearly and repeatedly held that mitigating factors always must be considered in deciding discipline. Indeed, the very cases *Mendell* cited with approval clearly state that mitigating factors are relevant even where misappropriation occurred. In *Witte,* after finding that counsel had commingled client monies with his own and that this was grounds for disbarment, the Court said, "all that remains to be done is to examine the evidence to determine whether there are mitigating circumstances either justifying or explaining the conduct of respondent and warranting lesser punishment." 615 S.W.2d at 422. It found there were not.

Similarly, *In re Mentrup* concerned an attorney who converted money from an estate in his care. This Court held that misappropriation is always a ground for disbarment, but then went on to consider whether the attorney's structural brain defect constituted a circumstance in mitigation that would make a lesser sanction more appropriate, stating:

> Mental illness can and should be considered a mitigating factor in determining the extent of discipline imposed. In some instances psychological disorders that affect an attorney's ability to practice law responsibly may properly suggest leniency.

665 S.W.2d at 325. The Court determined that leniency was not appropriate in *Mentrup* because the brain defect rendered the attorney unable to practice law and protection of the public required disbarment. *Id.*

Further, in stating that its holding was consistent with the great weight of authority, *Mendell* cited *In re Haggerty,* 661 S.W.2d 8 (Mo. banc 1983), which had stated "it has been uniformly held that *in the absence of mitigating circumstances* misconduct of attorneys in appropriating funds held by them in a fiduciary capacity justifies disbarment." *Id.* at 10 (emphasis added).

*Mendell* can best be understood as holding that in cases of intentional stealing and fraud, such as were present in *Mendell,* a lack of prior misconduct, and a history of good works and legal accomplishments cannot prevent disbarment. It does not suggest that mental illness affecting one's ability to control one's conduct, or such factors as making full voluntary restitution and voluntary self-reporting of the misconduct, may not be sufficient to preclude disbarment in a particular case. Rather, in misappropriation cases, as in other cases, in accordance with the ABA Standards and with this Court's relevant case law, this Court will consider the misconduct in light of mitigating and aggravating factors in deciding what discipline to impose. *See In re Charron,* 918 S.W.2d 257,

262 (Mo. banc 1996) (imposing one-year suspension rather than disbarment on attorney who had misappropriated client funds because of mitigating factors "not found in previous misappropriation cases").

### C. *Mr. Belz's Case Presents Compelling Mitigating Factors*

Here, Mr. Belz claims that a key mitigating factor is his bipolar disorder. This Court has previously recognized that mental illness such as this can be a mitigating factor. *See In re Tessler*, 783 S.W.2d 906, 910 (Mo. banc 1990) ("respondent's emotional and mental state [are] mitigating factors"); *In re Kopf*, 767 S.W.2d 20, 23 (Mo. banc 1989) ("mental state is properly to be considered a mitigating factor"); *In re Mentrup*, 665 S.W.2d at 325 ("mental illness can and should be a factor in determining the extent of the discipline imposed").

ABA Standard 9.32(i) provides that mental disability is a mitigating factor when the following conditions are met:

(1) there is medical evidence that the respondent is affected by a . . . mental disability;

(2) the . . . mental disability caused the misconduct;

(3) the respondent's recovery from the . . . mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

The disciplinary hearing panel found that the first three of these conditions were met. This Court concurs and finds that the fourth condition is met as well.

■ While OCDC implies by negative implication that it does not believe that Mr. Belz has a mental disability or that it affected his ability to control his conduct, it offered no evidence to contradict the substantial factual and expert evidence presented by Mr. Belz that he suffers from bipolar disorder, for which he has been treated by Dr. Holemon since he first experienced episodes of manic behavior in 1975. As the panel noted (citations and paragraph numbers are excluded at the points indicated by ellipses):

> Bi–Polar [sic] disorder is a disease of the brain where the brain cannot regulate the person's mood from going way up or down, and it is understood by physicians treating Bi–Polar disorder that the cause of the disease stems from a chemical imbalance in the brain . . . Bi–Polar disorder is not curable, but it is treatable. Respondent suffered a recurrence of a manic state from 1998 into 2002. . . . The beginning of the manic state was at or near the time in 1998 when Respondent began drinking alcohol. . . . During the manic state, Respondent exhibited symptoms of unusual spending, grandiosity, lack of judgment, and inability to appreciate the consequences of his actions. . . . At the time of the hearing, Dr. Holemon had successfully treated Respondent for his Bi-polar disorder since May, 2003. . . . Respondent has recovered from the manic state he suffered and his recovery has been demonstrated by a meaningful and sustained period of successful rehabilitation and treatment.

The only factor that the panel did not find present was the fourth factor, which asks if "the recovery arrested the misconduct and recurrence of that misconduct is unlikely." For this reason, it found that the mental illness could not be considered a mitigating factor and recommended disbarment.

As there is nothing in the record to suggest that the misconduct has recurred since Mr. Belz's recovery, this Court must presume the panel was unsure whether a

recurrence of the misconduct was unlikely at some future point. In this regard, the panel made no reference to Mr. Belz's continued care by Dr. Holemon or to the fact that the only evidence is that his condition is controlled by his medication so long as he takes it. Here, Dr. Holemon stated that Mr. Belz is compliant with his medication, that if he continues taking it a recurrence is unlikely, and that he will continue to monitor Mr. Belz. Mr. Belz agreed in his brief to continued monitoring of his condition for a five-year probationary period.

In these circumstances, this Court cannot agree with the disciplinary hearing panel that Mr. Belz has failed to show that recovery arrested the misconduct and that a recurrence of that misconduct is unlikely. So long as Mr. Belz is under a doctor's monitoring and is taking his medication, the Court concludes that this condition is met.

This determination is consistent with that reached in other jurisdictions considering the mitigating effect of mental illness, even in misappropriation cases. *See, e.g., Iowa Supreme Court Disciplinary Bd. v. Kress,* 747 N.W.2d 530, 541 (Iowa 2008) ("In considering sanctions, we agree . . . that mental and physical conditions may be mitigating factors."); *In re Crescenzi,* 51 A.D.3d 230, 853 N.Y.S.2d 322, 325 (2008) ("it is well settled that an attorney who intentionally converts client funds is presumptively unfit to practice law, however, that presumption can be rebutted by a showing that the misappropriation was caused by drug addiction or mental illness").

The reason for this approach in cases of mental illness is well illustrated by *In re Zakroff,* 934 A.2d 409, 421 (D.C.Ct.App. 2007). The District of Columbia generally takes a strict approach in misappropriation cases, finding that such conduct "warrants disbarment in virtually all cases," because:

> While we recognize that the sanction for intentional misappropriation of client funds will be harsh in comparison to sanctions for other disciplinary violations involving conduct some may view as roughly equivalent misconduct, . . . our concern is that there not be an erosion of public confidence in the integrity of the bar. Simply put, where client funds are involved, a more stringent rule is appropriate.

*Id.* at 421, n. 14. Nonetheless, the District of Columbia has concluded that sanctions *less than disbarment* are appropriate where attorneys have misappropriated client funds, but have some mental disability as a mitigating factor. *See, e.g., In re Verra,* 932 A.2d 503, 503–04, 2007 D.C.App. Lexis 484, *1–2, 5 (D.C.2007) (lawyer misappropriated client funds and wrote a check to client with insufficient funds, but court stayed disbarment and placed lawyer on conditional probation because of a causal relationship between her depression and her misconduct); *In re Mooers,* 910 A.2d 1046 (D.C.2006) (lawyer acknowledged having used funds in the account for personal and business expenses, but stayed disbarment and placed lawyer on three-year conditional probation because lawyer suffered from major depression and his misconduct would not have occurred but for his depression).[3]

---

**3.** *See also In re Cappell,* 866 A.2d 784 (D.C. 2004) (attorney used client funds for personal and business expenses, court stayed disbarment and placed lawyer on three-year conditional probation because lawyer suffered major depression that contributed to

his misconduct); *In re Larsen,* 589 A.2d 400, 402 (D.C.1991) (attorney used client funds for his own purposes and misconduct resulted from his bipolar or manic depressive disorder; court disbarred attorney but stayed

This Court agrees with these other jurisdictions that in a rare but appropriate case a sanction other than disbarment may be appropriate for intentional misappropriation where mental illness is shown to have played a role in the misconduct and other substantial mitigating factors are also present.

This is such a case. As the panel found, Mr. Belz self-reported his misconduct. As OCDC recognized at argument, Mr. Belz's misconduct probably never would have come to light absent that self-reporting. This is an extremely significant mitigating factor. *See* ABA Standards 9.32(e) (noting that "full and free disclosure to disciplinary board or cooperative attitude during proceedings" is a mitigating factor). As this Court imposes discipline, it seeks to protect the public and the legal profession from these types of misconduct. The public and the legal profession will both be better served if lawyers who find themselves in Mr. Belz's situation recognize their misdeeds and report them to the disciplinary authorities.

The ABA Standards also recognize "timely good faith effort to make restitution or to rectify consequences of misconduct" as a mitigating factor. ABA Standards 9.32(d). Mr. Belz restored all misappropriated funds to the trust account and did so voluntarily before he reported his misconduct, rather than being forced or compelled to do so by OCDC.[4] Indeed, prior to 2000 he had restored funds promptly within a short time after borrowing them. Even when he did not promptly pay back the account, he always kept an accurate record of his borrowings in the trust fund records, which showed that the monies he borrowed were owed to the fund. This case is very different from those cited by OCDC in which the attorney simply stole funds, tried to hide it, and failed to make restitution until compelled to do so.

In addition to his mental illness, self-reporting, and timely and voluntary restitution, Mr. Belz has no prior disciplinary history and has shown remorse for his conduct, which are also mitigating factors. ABA Standards 9.32(a), (*l*). Moreover, Mr. Belz's clients were not *actually* harmed by his misconduct. Although the failure of an injured client to complain is considered neither aggravating nor mitigating, ABA Standards 9.4(f), the Court notes that the client from whose account the funds were taken not only did not complain, but has chosen to remain Mr. Belz's client even after learning of the misconduct. All of these factors distinguish this case from the cases relied on by OCDC in which disbarment was the appropriate sanction.[5]

*D. Suspension is Appropriate Discipline in this Case*

Even though this case is unique in the quantity and type of mitigation present, this Court must reject Mr. Belz's argument that a stayed suspension with probation is proper. As this Court and many others have recognized, misappropriation of client funds presents a paramount risk to the integrity of the legal profession.

the disbarment and imposed a period of conditional probation).

4. While OCDC notes that he had told his son and law partners about the misconduct when he became severely ill and was hospitalized, that conduct was itself voluntary, and the disciplinary panel found and the record supports that they decided jointly to self-report and voluntarily restored the funds he had borrowed that had not already been restored.

5. The Court notes that the disciplinary proceeding took five years before argument here. Delay in disciplinary proceedings is a mitigating factor. ABA Standards 9.32(j).

Our profession relies intrinsically on the trust that clients are willing to place in their lawyers, and few acts of misconduct have the capacity to erode that trust more quickly and thoroughly than the conversion of a client's funds to one's own use. Even when such conduct is recorded properly and undertaken in a manic state, as it was here, this Court condemns this conduct in the strongest possible terms. Mr. Belz acted with a dishonest and selfish motive in taking his clients' funds, he did so multiple times, and he had substantial experience with the law. A stayed suspension is simply not appropriate for this type of misconduct.

In this case, an unusual array of compelling mitigating factors has collided with extreme and gross misconduct unbecoming of a member of the bar. Under the unique facts of this case, this Court concludes that the appropriate sanction is to suspend Mr. Belz from the practice of law indefinitely without leave to apply for reinstatement for three years. In addition to the conditions for reinstatement set forth in Rule 5.28, Mr. Belz must establish that he has continued to receive effective treatment for his bipolar disorder through the duration of his suspension and, as a part of any application for reinstatement, that he will continue such treatment into the future.

## IV. CONCLUSION

For the reasons set forth above, Mr. Belz is indefinitely suspended from the practice of law without leave to apply for reinstatement for three years.

LIMBAUGH, RUSSELL and BRECKENRIDGE, JJ., concur.

WOLFF, J., dissents in separate opinion filed.

PRICE and TEITELMAN, JJ., concur in opinion of WOLFF, J.

MICHAEL A. WOLFF, Judge, dissenting.

"Hard cases make bad law" is a familiar adage that seems to fit this case. The adage appears in a dissent by Justice Oliver Wendell Holmes, Jr. "Great cases, like hard cases, make bad law," Holmes said. "For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." [1]

I have long believed that disbarment is the penalty for stealing from clients. But this is a hard case because the respondent Mr. Belz, as the principal opinion ably notes, appears to have had a long and otherwise honorable career as lawyer and as a church and civic leader, as well as to have overcome, for the most part, a mental illness that he has endured through much of his life.

Moreover, when it comes to assessing punishments, I have learned over time that hard-and-fast rules often produce injustice and social dysfunction. Nevertheless, stealing is stealing. If there are certain immutable rules, then surely this is one: Lawyers may not steal from their clients. Not even borrowing without permission with the intention of repaying—it is still stealing. A license to practice law is not a license to steal. We should not give cynics, who may believe otherwise, any support for their wrong-headed view—regardless of mitigating circumstances. There

---

**1.** *Northern Sec. Co. v. U.S.*, 193 U.S. 197, 400– 401, 24 S.Ct. 436, 48 L.Ed. 679 (1904).

are in fact no mitigating circumstances: no medical or psychiatric excuse mitigates this behavior. Lawyers must be held to this standard of honesty despite their individual circumstances.

Stealing from clients should result in disbarment. This is a well-settled principle that we should not bend.

I respectfully dissent.