**In the Matter of Stephen W. MENDELL, Respondent.**

No. 65604.

Supreme Court of Missouri, En Banc.

June 25, 1985.

Rehearing Denied Aug. 7, 1985.

Errol D. Taylor, St. Joseph, for informant.

Dan Adams, Stephen W. Mendell, St. Joseph, for respondent.

BLACKMAR, Judge.

This case presents the tragic story of a young lawyer of ability and apparent good reputation who represented to a client that a case had been settled for $7,500, and made appropriate remittance to the client, when in truth the settlement had been for $8,000, and an additional amount of at least $336 should have been remitted. He attempted to conceal the discrepancy for many months, using numerous deceptive devices, and offered to make restitution only when confronted by unassailable proof before the Bar Committee of the Fifth Judicial Circuit. The Master, the Honorable J. Morgan Donelson, made appropriate findings which are adequately supported by the record. We concur in these findings, with one exception which will be noted later. Neither the Master nor able counsel for the Bar Committee has made a recommendation as to the appropriate sanction. We conclude that the offense is of such seriousness that the respondent must be disbarred.

The respondent was retained by a 57-year-old widow, to press a personal injury case against the City of St. Joseph. The client paid a retainer of $250 and signed a contract calling for a one-third contingent fee if the case were settled without litigation. Following negotiations with the insurer the respondent obtained the client's consent to settle the case for a minimum of $7,500, which the insurance company had offered, although she expressed hope that a larger settlement could be obtained.

On December 22, 1981 the respondent agreed with the insurance adjuster on a settlement for $8,000. The insurance company mailed a letter of confirmation enclosing a draft and a release on December 23. The release was on a form customarily used by the insurance company. The draft was in the usual form, payable to the respondent and his client. The release, dated December 27, 1981, contains the purported signature of the client and the respondent's signature as a witness. Respondent said that he signed the name of his client, which is in distinctly different handwriting from that of respondent's signature on the document. He claims that he modified his handwriting for legibility purposes. The draft was endorsed with the same two signatures.

On January 4, 1982 a check for $5,000 was mailed from the respondent's office to the client. This sum represented two-thirds of $7,500. The appropriate share of an $8,000 settlement would have been at least $5,336.00. The release was returned to the insurer by mail on the same day.

On January 8, 1982 the client called the respondent, asking for a copy of the settlement documents and also requesting a refund of the retainer. On that same date the respondent sent her a check for $200, as a refund of the retainer. He did not forward any "settlement documents."

The client repeated her request for the documents and, on February 8, 1982, respondent mailed her a copy of a purported release on a general release form supplied by a legal stationer (different from the form used by the insurance company which had made settlement), bearing his signature as "attorney and agent" and reciting a settlement for $7,500. A secretary had signed as witness to his signature. This document obviously is fraudulent and the original was never actually uttered.

The client still was not satisfied and enlisted the aid of her son, who contacted the St. Joseph City Attorney's Office. This call was reported to the respondent, who wrote the son on March 8, 1982. The respondent stated in the letter that his client had acknowledged receipt of a copy of "the release." He transmitted a file from which he admitted removing all references to the insurance company. The file, particularly, did not include a letter of December 23, 1981 reciting a settlement of $8,000.

Claimant's son still was not satisfied, and asked for documentation other than the previously tendered release to show the amount of the settlement. Respondent on April 30, 1982 requested the insurance company to furnish copies of the release and the draft. He also requested that the insurance adjuster deal directly with him, and not with the claimant or her son. He said that the insurance company did not furnish him the requested documents.

On October 5, 1982 the client and her son arranged to visit the respondent at his office. At this time the respondent told them the names of the insurance company and of the adjuster. Some time in November of 1982 the insurance company supplied the son with copies of the release showing settlement for $8,000 and of the draft in that amount. During the October meeting the respondent indicated for the first time that there might be some discrepancy and that the claimant might be entitled to an additional sum. The claimant's son, after speaking to a lawyer in his home city, reported the variation between the two releases to the Bar Committee.

The respondent offered a variety of explanations. The Master did not credit his explanations and neither do we. He said that he had assumed that the settlement amount would be $7,500 and had post-dated a check for the client's share of a settlement for that amount. The Master found that the $5,000 check was not post-dated. It is patent that, at the time this check was mailed, the respondent knew that the settlement amount was $8,000. He at one point asserted that the $7,500 release had been prepared, signed and placed in his file when he assumed that the settlement would be for that amount, and that a secretary had mailed a copy to the client without his approval. His reference to the release in subsequent correspondence with the client's son refutes this claim. He seeks to explain his supplying of an expurgated file by suggesting that he did not keep copies of the true release and draft, and wanted to get these from the insurance company before discussing the facts with claimant and her son. We need not expound on other discrepancies. The attempted explanations are not only false; they were made with intent to deceive and serve to exacerbate the offense.

The evidence shows that the respondent sought to deceive the insurance company by tendering a release with the client's purported signature, and by causing the draft to be endorsed with the same signature. His assertion is that he thought he had the client's authority to sign the documents as her agent. If so the signatures should have disclosed his agency. Instead, he tendered a signature of his client's name in handwriting substantially different from his, and signed as a "witness" to that signature.

He sought to deceive the claimant by sending a check appropriate for a $7,500 settlement when he knew at the time that the settlement amount was $8,000. He compounded this deceit by sending her a purported release reciting a consideration of $7,500.

He sought to deceive the claimant and her son by referring to the fictitious re-

lease in correspondence and furnishing a file from which references to the insurer and the $8,000 settlement had been expurgated.

He sought to deceive the Bar Committee by tendering false explanations, and by furnishing a similarly expurgated file.

He retained the settlement proceeds in excess of $7,500. We do not believe that he had any intention of making any accounting for the additional sum, but rather hoped that the client would accept his representation that the settlement amount had been $7,500. He tendered an adjustment only when confronted by the Bar Committee with the false release of $7,500 and the true release for $8,000. The offer of restitution, of course, does not condone the offense. *In re McCormick*, 281 Or. 693, 576 P.2d 371 (1978). *See, In re Houtchens*, 555 S.W.2d 24 (Mo.banc 1977).

We note the Master's statement that "it seems improbable that Mr. Mendell attempted to steal $500 from Mrs. Stanton." If this is a finding of fact that respondent did not intend to retain the $500, we reject it as inconsistent with the balance of the Master's findings and the overwhelming manifestation of the record. We are convinced that, had the client and her son not persisted, no further settlement proceeds would have been remitted. The respondent referred several times to his successful practice and asked, rhetorically, whether he would have risked his license for $336. The evidence strongly indicates that he did just that. His diligent counsel asserts that he was merely foolish. The clear purport of the record refutes this contention.

We conclude, as did the Master, that the respondent violated Mo.S.Ct. Rule 4 DR 1–102(A)(1), (4), (5) and (6).[1] The violation was willful, deliberate and inexcusable. We follow our recent cases holding that an appropriate remedy for willful conversion or misappropriation of client's funds is disbarment. *In re Witte*, 615 S.W.2d 421 (Mo. banc 1981); *In re Mentrup*, 665 S.W.2d 324 (Mo.banc 1984). *See also In re Maier*, 664 S.W.2d 1, (Mo.banc 1984). Our conclusion is consistent with the great weight of authority.[2] Any earlier decisions indicating that a lesser sanction might be considered in cases such as this are no longer authoritative. We acknowledge the respondent's evidence of good character and reputation, efficient handling of clients' business, and willingness to accept pro bono work. This evidence demonstrates with full force the personal tragedy involved, but does not overcome the manifest showing in the evidence nor does it mitigate the seriousness of the offense.

Disbarment of course is the ultimate sanction and should be reserved for a clear case. Honesty, however, is an all important quality for an attorney. Situations in which a dishonest attorney could deceive a trusting client arise far too often. Respondent demonstrated his willingness to defraud his client and we have no assurance that there will be no repeated offenses given the opportunity. The purpose of disciplinary action is to protect the public. No lesser sanction is consistent with this purpose.

The respondent is disbarred.

RENDLEN, C.J., HIGGINS, BILLINGS and WELLIVER, JJ., SATZ, Special Judge, HOUSER, Senior Judge, concur.

GUNN and DONNELLY, JJ., not sitting.

---

1.   (A) A lawyer shall not:
    (1) Violate a Disciplinary Rule.
       *    *    *    *    *    *
    (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
    (5) Engage in conduct that is prejudicial to the administration of justice.

    (6) Engage in any other conduct that adversely reflects on his fitness to practice law.

2.   *In re Houtchens, supra. In re Haggerty*, 661 S.W.2d 8 (Mo. banc 1983). *In re Edward L. Simmons*, 576 S.W.2d 324 (Mo. banc 1979).