

# SUPREME COURT OF MISSOURI
## en banc

*Opinion issued November 22, 2022*

IN RE: LORENZO ANTOINE HESTER,    )
                             )      No. SC99550
         Respondent.      )

## ORIGINAL DISCIPLINARY PROCEEDING

The Office of Chief Disciplinary Counsel ("OCDC") charged Lorenzo Antoine Hester with violations of the Rules of Professional Conduct. After an evidentiary hearing, Hester rejected the disciplinary hearing panel's recommendation of disbarment. Before this Court, Hester seeks an order imposing discipline no greater than an indefinite suspension of his law license, with leave to reapply for reinstatement after two years. Following a *de novo* review of the record, this Court finds Hester violated rules pertaining to the client-lawyer relationship in the realm of communication, fees, prohibited transactions, and safekeeping property. He also violated Rule 8.4(c) by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. After consideration of mitigating and aggravating factors, this Court orders Hester disbarred.

**Procedural History**

In April 2021, OCDC determined probable cause existed that Hester was guilty of professional misconduct. OCDC prepared an information in four counts, alleging the violation of numerous rules. Hester filed an answer to the information. A two-day hearing occurred in October 2021 before a disciplinary hearing panel.

The panel issued its decision in February 2022. Two panel members recommended Hester be disbarred. One member recommended a three-year suspension. OCDC accepted the panel's decision recommending disbarment. Hester rejected the decision, and, as a consequence, the matter was set for briefing and argument before this Court. *See* Rule 5.19(d)(2).

**Standard of Review**

"This Court has inherent authority to regulate the practice of law and administer attorney discipline." *In re Gardner*, 565 S.W.3d 670, 675 (Mo. banc 2019). The panel's findings, conclusions of law, and recommendation are not binding. *Id.* This Court reviews the evidence *de novo* and reaches its own conclusions of law. *Id.* Before imposing discipline upon an attorney, the "[p]rofessional misconduct must be proven by a preponderance of the evidence." *In re Kayira*, 614 S.W.3d 530, 533 (Mo. banc 2021).

**Findings of Fact and Conclusions of Law**

Hester was admitted to practice law in Missouri in April 2004. In addition to his law degree, obtained in 2003, Hester previously earned a master of business administration in 1995. After licensure, Hester worked part-time for his own law firm, The Hester Group LLC, while also working full-time for Centene as the director of information security and compliance. After leaving Centene in approximately 2012, Hester transitioned to working full-time for his law firm. His practice evolved to primarily representing clients in personal injury and workers' compensation matters. He has three law offices in the St. Louis area.

At the time of the disciplinary hearing, Hester's license was active and in good standing. Hester accepted a written admonition, pursuant to Rule 5.11, in April 2011 for violations of Rules 4-1.3 (Diligence), 4-1.16 (Declining or Terminating Representation), and 4-3.2 (Expediting Litigation). Later in 2011, Hester received a letter of caution from OCDC for violating Rule 4-1.15 (Failure to Reconcile Trust Account). The letter provided information regarding a continuing legal education course titled "Fundamentals of Trust Accounting" and informed Hester to register for the course. OCDC's communication apprised Hester that his participation in the course would be considered favorably if he should subsequently become the subject of similar disciplinary investigations. Hester was instructed to report his attendance. In May 2012, OCDC contacted Hester to notify him it did not have a record of his attendance. Hester never attended the course. He testified he had no excuse for failing to attend, other than he was "just overwhelmed with things."

3

The information filed against Hester contained three counts relating to specific clients and a fourth count generally alleging trust account violations, unreasonable fees, and dishonesty.[1]

### A. Representation of Richard Payne

In December 2016, Richard Payne retained Hester's services for a personal injury claim arising out of a motorcycle accident. Hester informed Payne he would file a lawsuit. He subsequently told Payne he could settle the matter outside of court. After learning a lawsuit was not filed, Payne discharged Hester in June 2019 and retained new counsel. Payne then discovered Hester had submitted a claim to Payne's personal automobile insurance carrier for $500 in medical payments coverage.

In February 2017, the insurance carrier sent a $500 check to Hester's law office. Hester signed Payne's name on the back of the check, despite lacking the authority to do so. Hester did not have a power of attorney allowing him to endorse the check. The proceeds from the check were deposited into Hester's operating account, not into his trust account.

Payne filed a complaint to OCDC in January 2020. Hester subsequently sent Payne $500, along with a letter of apology.

---

[1] In accord with the panel, this Court finds certain allegations in the information were not proven by a preponderance of the evidence. OCDC did not pursue these allegations in its briefing. These allegations are not discussed in this opinion.

Hester is guilty of professional misconduct as a result of violating Rule 4-1.15(a)[2] when he failed to deposit the check from the insurance carrier into his trust account. Hester is further guilty of professional misconduct as a result of violating Rule 4-1.15(d)[3] when he failed to notify Payne he had received the insurance carrier's check, money in which Payne had an interest.

## B. Representation of Sierra Davis

In October 2019, Sierra Davis retained Hester to represent her for a personal injury claim arising from an automobile accident. Shortly thereafter, Hester provided Davis a check for $300. The check memo indicated it was intended for "medical and travel expenses." Davis used the money as a deposit for a rental car. Hester testified he believed the $300 payment was permitted. Prior to February 2020, Hester advanced funds in this manner "frequently."

In June 2020, Davis filed a complaint with OCDC. In addition to other grievances, her complaint referenced the money Hester advanced. Davis hired new counsel, who likewise filed a complaint with OCDC suggesting Hester's check to Davis appeared to violate Rule 4-1.8.

At the beginning of the representation, Davis signed Hester's contingent fee agreement. The agreement provided:

---

[2] Rule 4-1.15(a) provides, in relevant part, "A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property."

[3] Rule 4-1.15(d) provides, in relevant part, "Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person."

You agree to pay Us a fee equal to (1) 33.333% of all amounts offered, obtained or recovered if settled prior to filing suit, or Forty (40%) percent of all amounts offered, obtained, or recovered after suit is filed; plus (2) reimburse Us for any expenses paid by Us for the investigation and prosecution of the case.

In bold letters, the agreement's fee section continued: "If settlement without filing suit, Attorney Legal fees shall not exceed Client's proceeds. In addition all aggregate total Provider Service fees shall not exceed Client's proceeds less any fees for records or travel and/or medical reimbursements." In a separate section governing liens and provider bills, the agreement stated:

You authorize us to attempt to reduce provider bills and liens to lessen amounts paid or owed to providers. We are not obligated to achieve a reduction; in the event we are able to achieve a reduction we shall pay the provider and *our fee* for such services through those efforts.

(Emphasis added).

Hester admitted the language in the agreement "could have been a lot more clear[]" as to what he was taking for a fee in his efforts to reduce provider bills and liens. In operation, Hester kept any reductions as firm fees. None of the reductions went to any client, nor was any client notified of the reduction or of the amount being kept as fees. Davis testified Hester did not explain he would be charging an additional fee for negotiating reductions in medical bills.

Hester is guilty of professional misconduct for violating Rule 4-1.8(e)[4] when he provided financial assistance to Davis. Hester also violated Rule 4-1.4(b)[5] because he failed to explain to Davis what his fee would be for reducing liens and provider bills. This hindered Davis's ability to make an informed decision about the representation.

### C. Representation of Oscar Neal and Josephine Clark

Oscar Neal and Josephine Clark were in an automobile accident in October 2014 and retained Hester to handle their cases. Hester filed a lawsuit on behalf of Neal.

In June 2020, Neal filed a complaint with OCDC, alleging Hester and his contract attorney misrepresented Neal's case status to the court. In June 2018, the contract attorney informed the court the case should be continued to allow a settlement to be completed. In September 2018, the contract attorney informed the court, by written memorandum, that the case was settled and that counsel was negotiating liens. Hester takes responsibility for the content of the court memoranda. The case was not settled until October 2019.

In October 2019, Hester presented Neal with a check for $5,600 from Hester's trust account. Neal signed a full and final release, which indicated the case had settled for $25,000. The specific funds were not in Hester's trust account. In fact, Hester never sent the release to the insurance company.

On the same day, Hester had Neal sign a document titled "General Release of All Claims." The instrument "release[d] The Hester Group LLC and Lorenzo Hester … from

---

[4] Rule 4-1.8(e) provides, with exceptions not relevant here, "A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation[.]"

[5] Rule 4-1.4(b) provides, "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

all claims of any kind whatsoever from the beginning of time to the date of the execution of [the] release." Hester testified he informed Neal that Neal should seek independent counsel, but the client wanted the money immediately. Neal did not have another lawyer review the release before signing.

Clark, while she was Hester's client, received advances from Hester totaling $1,350 for "medical and travel."

Hester is guilty of professional misconduct as a result of violating Rule 4-1.15(a)(6)(A)[6] when he provided Neal with a check for $5,600 from his trust account in full settlement of his claim without having received or deposited any settlement proceeds. The money Hester paid to Neal from the trust account was another client's money. In making this disbursement, Hester misappropriated the funds of another client and, thereby, violated Rule 4-8.4(c).[7] By having Neal sign an agreement prospectively limiting Hester's liability for malpractice without Neal being independently represented, Hester violated Rule 4-1.8(h)(1).[8] Finally, the $1,350 advance to Clark violated Rule 4-1.8(e).

### D. Trust Account Audit

As part of the investigation into client complaints, OCDC staff examined Hester's trust accounts. During the relevant audit period, Hester had three trust accounts, one of

---

[6] Rule 4-1.15(a)(6)(A) prohibits disbursements made based upon a deposit "if the lawyer has reasonable cause to believe the funds have not actually been collected by the financial institution in which the trust account is held[.]"

[7] Rule 4-8.4(c) states it is professional misconduct for an attorney to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

[8] Rule 4-1.8(h)(1) prohibits an attorney from "mak[ing] an agreement prospectively limiting the lawyer's liability to a client for malpractice unless the client is independently represented in making the agreement."

which was opened in February 2020 after Hester was notified of OCDC's audit. The audit focused on one trust account's activity from August 2018 through December 2020.[9] In February 2020, OCDC requested Hester's bank records and general ledger. After repeated requests for Hester to supply missing information, OCDC subpoenaed the bank records in November 2020. In August 2020, OCDC requested settlement statements from Hester for the trust account. When Hester eventually responded, the records he provided were not responsive to the request. OCDC received 21 statements pertinent to the timeframe of the audit, which OCDC estimated represented a mere 10 percent of those it had sought.

To facilitate the audit, OCDC ultimately agreed to accept unsigned settlement statements from Hester. The investigator believed she would be receiving the same document, reprinted, as would have been given to the client to sign. Instead, Hester produced statements he created in response to the request. These statements were not produced or kept contemporaneously in the normal course of his practice. At the time he produced the settlement statements, Hester did not disclose they were fabricated.

Hester created the settlement statements based on estimations, not on specific accounting. OCDC compared the created settlement statements with the bank records and found the settlement statements to be erroneous and often not in accord with the bank records: disbursements listed were not actual disbursements from the trust account;

---

[9] Hester testified the newest trust account existed for the purpose of "clean[ing] things up going forward." In addition to the trust account upon which OCDC focused, the auditor referenced the other older trust account because certain transactions in that account were relevant.

disbursements had been made that were not listed; and disbursements listed for a certain amount were actually made for a different amount.

During the October 2021 hearing, Hester sought to introduce, for the first time, 159 settlement statements. OCDC had repeatedly requested these settlement statements throughout the process. Ten of the settlement statements were unsigned and were created after February 2020. Hester testified the remainder existed at the time the clients signed them. No documentation supported the amounts reflected on the settlement statements or that the payments were made. Hester testified that, in most instances, the providers did not actually receive the amount shown on the settlement statements because the amounts did not reflect any sort of negotiations or reductions that occurred. He further testified he did not withdraw attorney fees from his trust account on a case-by-case basis, so that figure on the settlement statements was also inaccurate.

OCDC's audit revealed pervasive trust account mismanagement. Hester did not maintain individual client ledgers for his trust accounts or receipt and disbursement journals. Hester failed to reconcile his trust accounts, and evidence showed such task would have been impossible with the limited records Hester maintained. Hester did not withdraw earned fees from his trust account in a timely manner or based on any specific accounting of fees earned. He often deposited certain clients' funds into one trust account and made disbursements related to those clients' deposits from a different trust account. Hester commonly made written memos on checks describing payments he made to clients as "full settlement" of their matters in advance of the time he deposited settlement checks to the trust account, prior to payment of lienholders, and before he had established the client

10

had no remaining funds to be disbursed. Hester did not maintain accurate settlements sheets or similar records detailing all payments received and disbursed on behalf of the client. In his testimony, Hester stated he maintained settlement statements in his client files for about a year after the case closed. He did not preserve complete records of trust accounts, including fee arrangements and accountings to third parties, for at least six years.

The audit specifically showed 175 instances in which Hester paid his clients in purported "full settlement" of their claims before settlement proceeds were received and deposited into the trust account or paid clients or third parties before settlement proceeds were received, deposited, or had become "good funds." On 27 occasions, Hester paid individuals out of the trust account with no corresponding proceeds from a matter. These individuals had no funds held in the trust account. The audit found 60 instances in which Hester deposited client settlements into one trust account and disbursed from another trust account.

During the audit period, and since 2017, Hester used a contingent fee agreement stating his fee in a settled matter would be one-third and with the language discussed previously:

> You authorize us to attempt to reduce provider bills and liens to lessen amounts paid or owed to providers. We are not obligated to achieve a reduction; in the event we are able to achieve a reduction we shall pay the provider and our fee for such services through those efforts.

Reductions were usually achieved through phone calls. Hester admitted this language did not specifically state what his fee would be. Hester routinely kept his agreed percentage of the gross settlement and then retained funds to pay expenses, healthcare providers, and

11

lien holders. After negotiating those amounts, he regularly retained the unpaid remainder without regard to reasonableness or his fee agreement. Clients were not notified of the amounts paid out and retained. The audit showed 39 instances in which Hester paid less than one-third of the settlement proceeds to the client, with no record of the remainder payment to expenses, healthcare providers, or lienholders. In 137 instances, Hester paid at least one-third of settlement proceeds to the client with no record of the remainder payment to expenses, healthcare providers, or lienholders.

The audit also found payments made to medical providers with memo notations indicating the payments were for multiple clients. These payments seemed to be in rounded dollar amounts. OCDC requested Hester identify the client and amount for each of the payments made to a provider that appeared to impact more than one client. Hester never produced this information.[10] OCDC likewise requested Hester break down the payments from his trust account to The Hester Group LLC. Hester routinely took rounded amounts as fees from the trust account without tying them to a specific case in which he had earned fees. Hester failed to provide this information.

On July 12, 2019, the trust account had a balance slightly more than $20,000. OCDC's audit determined the unpaid balance of funds from cases settled and deposited prior to that date was more than $560,000. In other words, there was a substantial shortfall between the unpaid balance of funds and the trust account balance. In OCDC's calculation,

---

[10] At the October 2021 hearing, Hester sought to introduce a list he had prepared showing which clients were associated with bulk payments to providers. The exhibit was not admitted because Hester testified it was based on his knowledge and belief as to who the clients were and there was no supporting documentation.

12

it estimated attorney fees at one-third because it lacked documentation to support a more specific determination. Even at a higher percentage, however, the difference between the unpaid balance of funds and the existing balance on the date would be significant.

In addition to the preceding trust account issues, Hester made 34 advances to clients for "med" or "med and travel" or "rental and medical" in amounts ranging from $60 to $1,000. In one instance, Hester deposited client funds into his operating account, commingling client money with his own. In two instances, Hester deposited personal funds into the trust account, again commingling client money with his own.

As of the date of the hearing, Hester had not made any payments to clients from the trust account on which OCDC focused. He had paid some providers, but he could not testify about the amount paid to these providers. Hester stated the trust account probably had about $900,000 in it and that he was working with an accountant on where the money should be distributed. The accountant was using the settlement statements Hester collected—which Hester admitted did not contain accurate information regarding amounts paid to providers—and the spreadsheet Hester synthesized regarding bulk payments to providers—which Hester formed based on his knowledge and belief as to who the clients were without supporting documentation. No taxes were being paid on the $900,000 in the trust account.

In February 2020, after notification of OCDC's audit, Hester received trust account training from his attorney in the instant matter and opened a new trust account. Hester also began using a law practice management software, tied to his new trust account, to maintain ledgers and track disbursements to clients, the firm, and third-party providers. According

13

to Hester, he now reconciles the new trust account on a monthly basis. Hester testified he currently asks for individual checks from the insurance company for the client, the firm, and the provider; the checks are given to the payees.

In managing his trust account, Hester violated multiple aspects of Rule 4-1.15 relating to the safekeeping of property. He violated subdivision (a) by depositing client funds into his operating account, failing to withdraw his fees from the trust account in a timely manner, and allowing what he believed to be his fees to accumulate, untaxed, in the trust account over time. He violated subdivision (a)(6)[11] by frequently making payments from his trust account without those specific funds existing. Hester's following practices were impermissible: disbursing funds prior to receiving insurance checks, depositing client settlements into one trust account and disbursing funds from another, and making payments from a trust account with no corresponding proceeds from a matter. Hester violated subdivision (a)(7)[12] by failing to reconcile his trust account during the audit period. He violated subdivision (b)[13] by twice depositing personal funds into his trust account in

---

[11] Rule 4-1.15(a)(6), in full, provides:
    No disbursement shall be made based upon a deposit:
    (A) if the lawyer has reasonable cause to believe the funds have not actually been collected by the financial institution in which the trust account is held; and
    (B) until a reasonable period of time has passed for the funds to be actually collected by the financial institution in which the trust account is held.
[12] Rule 4-1.15(a)(7), in reference to trust accounts, states, "A reconciliation of the account shall be performed reasonably promptly each time an official statement from the financial institution is provided or available."
[13] Rule 4-1.15(b) states, "A lawyer may deposit the lawyer's own funds in a client trust account for the sole purpose of paying financial institution service charges on that account, but only in an amount necessary for that purpose."

14

excess of the amount necessary to pay financial institution service charges. Hester violated subdivision (f)[14] by failing to keep complete trust account records. Not only did Hester admit to not keeping a receipt and disbursement journal and individual client ledgers, but he also demonstrated he had no accurate record-keeping regarding payments to providers. Additionally, he failed to keep trust account records for the requisite time period. Hester violated subdivision (d) by failing to notify clients and deliver all funds they were entitled to receive when he retained lien reductions.

Hester also ran afoul of rules related to fees. Hester violated Rule 4-1.5(a)[15] by collecting an unreasonable fee when he kept as firm fees any reduction that he obtained from liens and providers. Taking these reductions as firm fees was not customary according to evidence presented at the hearing. He further violated Rule 4-1.5(c)[16] by not

---

[14] Rule 4-1.15(f) states, in relevant part:
    *Complete* records of client trust accounts shall be maintained and preserved for a period of *at least six years* after the later of:
    (1) termination of the representation, or
    (2) the date of the last disbursement of funds.
    Client trust account records may be maintained by electronic, photographic, or other media provided that they otherwise comply with Rules 4-1.145 to 4-1.155 and that printed copies can be produced. *These records shall be readily accessible to the lawyer.*
(Emphasis added).
[15] Rule 4-1.5(a) provides that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses" and sets forth factors to consider in determining the reasonableness of said fee.
[16] Rule 4-1.5(c) states, in relevant part:
    A contingent fee agreement shall be in a writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client

explaining in his contingency fee agreement how the additional fee for reduction in liens and provider bills would be determined. He did not notify clients of the amount paid to the provider and the amount he kept for his fees. He admitted most settlement statements he provided to clients were inaccurate.

Finally, Hester committed misconduct related to maintaining the integrity of the profession. Hester violated Rule 4-8.4(c) when he told clients that he, as their attorney, would earn no more than they did; paid clients before the proceeds of settlement were disbursed and before he had negotiated liens and provider bills; and retained all portions of any reduction. Once he received reductions, Hester did not inform the client of the reduced amount being paid and the additional amount he retained. Hester also violated Rule 4-8.4(c) when he had clients sign settlement statements that included an amount for payments to providers when providers were routinely not receiving that amount. The attorney fees entered on those statements were, likewise, inaccurate. Finally, Hester violated Rule 4-8.4(c) when he misappropriated client funds in that his trust account fell below the amount of unpaid balance of cases settled and deposited prior to July 12, 2019.

---

of any expenses for which the client will be liable whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.

16

**Analysis of Appropriate Discipline**

This Court finds by a preponderance of the evidence that Hester committed the violations of the rules discussed previously, amounting to multiple acts of professional misconduct. The remaining issue is the appropriate disciplinary sanction.

This Court disciplines attorneys for two purposes: (1) to safeguard the public and (2) to uphold the legal profession's integrity. *In re Kazanas*, 96 S.W.3d 803, 807-08 (Mo. banc 2003). "Those twin purposes may be achieved both directly, by removing a person from the practice of law, and indirectly, by imposing a sanction which serves to deter other members of the Bar from engaging in similar conduct." *Id.* at 808.

In addition to the ethical duty violated, the Court looks to "the attorney's mental state, the extent of actual or potential injury caused by the attorney's misconduct, and any aggravating or mitigating factors." *In re McMillin*, 521 S.W.3d 604, 610 (Mo. banc 2017); *see also* American Bar Association's Standards for Imposing Lawyer Sanctions 3.0 (1992) ("ABA Standards"). "When this Court finds an attorney has committed multiple acts of misconduct, the ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among the violations." *McMillin*, 521 S.W.3d at 610.

"The most important ethical duties are those obligations which a lawyer owes to clients." *Id.* Included among these responsibilities is a duty to safekeep client property, Rule 4-1.15, and a duty to abstain from conduct involving dishonesty, fraud, deceit, or misrepresentation, Rule 4-8.4(c). Hester blatantly failed to adhere to these fundamental ethical duties.

17

ABA Standard 4.11 applies to the violation of Rule 4-1.15. That standard addresses the failure of an attorney to preserve the client's property and states, "Disbarment is generally appropriate when a lawyer knowingly[17] converts client property and causes injury or potential injury to a client." Hester commingled funds, failed to reconcile his trust account, transferred funds from his trust account to his operating account without any relationship to fees earned, paid clients before he received settlement checks, had clients sign settlement statements that falsely stated the amount paid to providers, and failed to inform clients of the reduced amount paid to providers or that he was keeping the difference as his fees. As a result, Hester failed to pay money owed to clients. OCDC demonstrated an instance in which funds in the trust account were significantly deficient. Despite being aware of the audit, which began nearly three years before the hearing, Hester had not made any restitution to his clients by the time of the hearing. Due to his failure to maintain required records, the magnitude of the injury is unknown, and his clients, most likely, can never be made whole.

Concerning Hester's violation of Rule 4-8.4(c), ABA Standard 4.61 provides, absent aggravating or mitigating circumstances, "[d]isbarment is generally appropriate when a lawyer knowingly deceives a client with the intent to benefit the lawyer … and causes serious injury or potential serious injury to a client." Hester had his clients sign contingent fee agreements that were misleading regarding his fees, paid them before the

---

[17] The ABA Standards define "knowledge" as "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result."

18

proceeds of the settlement were disbursed and before he had negotiated liens and provider bills, and retained all portions of lien reductions as his own after lien holders and providers agreed to reduce their claims. Once he achieved a reduction, Hester did not notify the client of the reduced amount paid to the provider and the additional amount he was keeping as fees. Instead, he had clients sign settlement statements that included payments to providers and attorney fees that did not reflect any negotiated reduction he kept. Although Hester maintains his conduct at issue was not due to dishonest or selfish motive, the manner in which Hester retained any benefit of reduction suggests otherwise. Again, because he failed to maintain required records, the magnitude of injury, although serious, cannot be precisely tabulated, and his clients, most likely, can never be made whole.

Using these ABA Standards as guidance, this Court agrees with OCDC that disbarment is the presumptive discipline in this case. Against this presumptive discipline, aggravating and mitigating circumstances must be considered to arrive at the appropriate discipline for Hester. *See In re Belz*, 258 S.W.3d 38, 42-44 (Mo. banc 2008).

In mitigation, Hester offered character references from legal colleagues, community leaders, and clients in the St. Louis legal community. The letters in support of Hester include references of his good character, noting he is responsible, honorable, professional, creative, analytical, and cares for his clients. Hester has also been an active volunteer in the St. Louis community. While the qualities referenced in the letters and his work in the community are commendable, neither address the specific allegations of the misconduct.

Hester also believes any discipline should be mitigated because he admitted to his mistakes and has made efforts to address the problems highlighted during OCDC's

19

investigation, particularly those related to the operation of his trust account. This corrective conduct, however, falls late and short. Hester testified he had his accountant working on the reconciliation of his trust account, but the accountant's health problems prevented him from continuing within the last five to six months before the hearing. Hester stated a new accountant had been working on it for the last couple of months before the hearing. He anticipated it would be cleaned up within 30 days but immediately qualified this statement, noting it would not be fully resolved. Hester was on notice of general problems with the trust account since 2011 when he received a letter of caution from OCDC for failure to reconcile his trust account. The letter provided information regarding a continuing legal education course titled "Fundamentals of Trust Accounting" and informed Hester to register for the course. He never attended the course and had no excuse for failing to attend. Hester was aware of grave problems with his trust account since OCDC's requests in 2020 for missing records. Resolution of the problems should have occurred long before the time immediately preceding the October 2021 hearing.

Many factors in aggravation exist. Hester has a prior admonition. *See* ABA Standard 9.22(a). There is a pattern of misconduct and multiple offenses. *See* ABA Standards 9.22(c), (d). Hester engaged in bad faith obstruction of the disciplinary proceeding. *See* ABA Standard 9.22(e). He failed to respond to repeated requests from OCDC for settlement statements and a breakdown of the bulk payments to providers. He then brought to the hearing and sought to introduce 159 settlement statements and a list he represented was a breakdown of the bulk payments to providers. Upon questioning by the panel, Hester admitted the information within the settlement statements, which he had his

20

clients sign, was inaccurate, and the breakdown of the bulk payments to providers was based only on his knowledge and belief of who the clients were. Hester used deceptive practices during the disciplinary process when he provided OCDC with settlement statements that he created after the fact and that were not kept in the ordinary course of business. *See* ABA Standard 9.22(f). Hester has substantial experience in the law as he has been licensed since 2004; in addition to his law degree, Hester also possesses an MBA. *See* ABA Standard 9.22(i). Hester has not paid restitution to any clients, *see* ABA Standard 9.22(j), and, although he said he has paid some money to providers out of the trust account since February 2020, he did not know how much. After consideration of both mitigating and aggravating factors, this Court's assessment is that aggravating factors heavily tilt the scale. Consequently, disbarment is the appropriate discipline.

Hester acknowledges trust accounting errors ordinarily result in serious sanctions, but he believes this Court's precedent supports a sanction other than disbarment. After reviewing the cases cited in Hester's briefing, many of which consisted of discipline imposed via order, as opposed to by opinion, this Court is confident the balance of factors in this case supports disbarment. Several factors set this case apart from those in which lesser discipline was imposed. Above all else, this Court finds Hester traversed the edge of unacceptable conduct by engaging in conduct that resulted in a financial benefit to himself and a loss to his clients. Hester's retention of all reduced provider bills and liens as firm fees under his interpretation of the contingent fee agreement harmed clients. Because of the disarray of Hester's recordkeeping, it is doubtful any proper allocation of funds to clients could occur. The sheer quantity of impacted clients cannot be ignored.

21

This was not a case of isolated circumstances. The misconduct was pervasive. Finally, Hester's engagement with the disciplinary proceedings impeded an efficient resolution. He repeatedly failed to respond to requests, provided misleading records, and eventually attempted to introduce records that had been previously requested but not produced and, ultimately, proved to be inaccurate.

## Conclusion

For the foregoing reasons, this Court orders Hester disbarred.

_____

Robin Ransom, Judge


All concur.