

# SUPREME COURT OF MISSOURI
## en banc

*Opinion issued January 31, 2023*

IN RE: PHILIP E. PREWITT, )
)  No. SC99627
Respondent. )

### ORIGINAL DISCIPLINARY PROCEEDING

The Office of Chief Disciplinary Counsel ("OCDC") charged Philip E. Prewitt with violations of the Code of Judicial Conduct and the Rules of Professional Conduct. All charges arise from Prewitt's conduct during his unsuccessful campaign to retain his position as associate circuit judge of Macon County against challenger Kristen Burks in the 2018 election. After an evidentiary hearing, Prewitt rejected the disciplinary hearing panel's recommendation of suspension. He maintains he did not engage in misconduct. Prewitt argues no discipline should be imposed or, if discipline is imposed, a suspension is not warranted. Following a *de novo* review of the record, this Court finds Prewitt violated Rules 2-1.2, 2-1.3, 4-1.9(c), 4-8.4(a), and 4-8.4(d). After consideration of mitigating and aggravating factors, and in consideration of the influential position Prewitt held when he committed the misconduct, this Court finds suspension with no leave to reapply for two years is the appropriate discipline.

## Procedural History

In December 2020, OCDC determined probable cause existed to believe Prewitt was guilty of professional misconduct.[1] OCDC prepared an information in three counts, alleging violations of the Code of Judicial Conduct and the Rules of Professional Conduct. Prewitt filed an answer to the information. Two days of remote hearings were conducted before a disciplinary hearing panel in 2021.

The panel issued its decision in March 2022, recommending this Court suspend Prewitt's law license indefinitely with no leave to apply for reinstatement for two years. OCDC accepted the panel's recommendation, but Prewitt rejected it. The matter was set for briefing and argument before this Court. *See* Rule 5.19(d)(2).[2]

## Standard of Review

"This Court has inherent authority to regulate the practice of law and administer attorney discipline." *In re Gardner*, 565 S.W.3d 670, 675 (Mo. banc 2019). Misconduct committed by a judge supports the imposition of discipline upon that attorney's license, even after resignation of the judicial position. *In re Burrell*, 6 S.W.3d 869, 869 (Mo. banc 1999); *In re Hasler*, 447 S.W.2d 65, 65-66 (Mo. banc 1969) (finding a former judge

---

[1] In fall 2018, the Commission on Retirement, Removal and Discipline ("Judicial Commission") filed an information against Prewitt. Prior to a hearing scheduled in December 2018 and after his unsuccessful bid for reelection, Prewitt resigned his position to protect his judicial pension and save attorney fees. His resignation divested the Judicial Commission of jurisdiction over the matter. The Judicial Commission's information is not in the record in the current case, but testimony from the disciplinary hearing indicates it was premised "on complaints going back to [Prewitt's] 2008 municipal [judge] election." It is unclear from the record the extent to which the conduct from the 2018 election was at issue in the information.

[2] Rule references are to Supreme Court Rules (2022), unless otherwise stated.

violated both judicial canons and rules of professional conduct for conduct prior to his resignation).

The panel's findings, conclusions of law, and recommendation are not binding. *Gardner*, 565 S.W.3d at 675. This Court reviews the evidence *de novo* and reaches its own conclusions of law. *Id.* Before imposing discipline upon an attorney, the "[p]rofessional misconduct must be proven by a preponderance of the evidence." *In re Kayira*, 614 S.W.3d 530, 533 (Mo. banc 2021).

**Findings of Fact and Conclusions of Law**

After reviewing the record, including transcripts from the disciplinary hearing and all exhibits before the panel, this Court finds the following:

Prewitt was admitted to practice law in Missouri in October 1992. From 2011 to 2018, Prewitt served as associate circuit judge of Macon County. He failed to retain his position in the November 2018 election. Prewitt is currently a commissioner for the Missouri Administrative Hearing Commission.

At the time of the disciplinary hearing, Prewitt's license was active and in good standing. In November 2015, this Court issued a reprimand to Prewitt, stating, "The parties have stipulated and the Court finds that Respondent engaged in misconduct under Article V, Section 24 of the Constitution and is in violation of Supreme Court Rule 2, Canons 1 and 2-1.2, 2-1.3, 2-2.10, 2-3.7 and 2-4.1." The misconduct stemmed from four counts: (1) engaging in a text message exchange with a candidate for circuit clerk that threatened Prewitt's involvement in the circuit clerk's campaign if she did not remove his opponent's signs from her yard; (2) maintaining a Facebook account identifying Prewitt as an associate

3

circuit judge through which he made 11 postings encouraging others to attend certain charitable events or make donations to certain charities; (3) criticizing other judges in a Facebook post by stating "unlike many other judges, I am very open about decisions I make in cases because I am proud of the work I do"; and (4) questioning a prosecutor during an arraignment about the strength of a case, advising that he did not want to unnecessarily prevent the defendant from playing football and that the prosecutor should dispose of the case.

The current information OCDC filed against Prewitt contains two counts that remain before this Court.[3]  Both counts relate to Prewitt's campaign for associate circuit judge against Burks in the course of the 2018 election.  One count encompasses threats made to Burks.  The other involves Prewitt's speech at a campaign event.  Prior events and interactions between Prewitt and Burks set the context for this Court's findings.

Prewitt and Burks previously opposed each other in the 2014 election for associate circuit judge.  Prewitt, the incumbent, ran as a Republican.  Burks ran as a Democrat. Directly before the election, Burks sent out a mailer disputing several of Prewitt's campaign claims.  The top of the mailer stated: "PREWITT…WORKING TO ***MISLEAD*** VOTERS."  Prewitt defeated Burks in the election.

Burks continued her employment in Macon County after the 2014 election.  She maintained a private law practice and served as an assistant prosecutor and juvenile officer. Her intentions to run again for associate circuit judge in the 2018 election eventually

---

[3] OCDC is no longer pursuing a count pertaining to Prewitt's campaign finance reporting to the Missouri Ethics Commission ("MEC").

became known in the community. In summer 2017, Burks encountered Prewitt in front of the courthouse before she was to appear before him in her capacity as the assistant prosecutor for the county. The details of the encounter are in dispute. According to Burks, Prewitt inquired whether she intended to run against him in the election. Burks responded she was still undecided. Prewitt purportedly stated, if she were to run against him that he would file an ethics complaint premised on the mailer sent before the 2014 election and that he knew about Burks' husband's conduct. Prewitt denies making any statement beyond asking Burks about her intention to run.

At the time of her testimony in Prewitt's disciplinary hearing, Burks and her husband had been married for 25 years. The couple has three children, then 15, 15, and 17 years old. In late 2012, Burks became aware that her husband had engaged in two affairs. In an effort to preserve their family, she and her husband worked to repair their marriage. Due to the children's ages in 2012, they were not told about the affair, and Burks did not believe they were aware of their father's actions.[4] Her husband's infidelity was not raised publicly in the 2014 election.

By early 2018, Burks had decided to run for the associate circuit judge position. Several members of the community, including Phillip Bray, the pastor of the Macon First Baptist Church; Steven Olinger, the former police chief of Macon; and Josh Meisner, Burks' then-law partner and prosecuting attorney for the county, relayed the substance of interactions with Prewitt to Burks. These conversations caused Burks to believe Prewitt

---

[4] At Prewitt's disciplinary hearing, Burks stated her children were still unaware of the affairs but acknowledged the information may come to light as a result of the proceeding.

planned to use her husband's conduct as part of his campaign. More specifically, Burks believed Prewitt planned to make a special effort to harm her children in doing so.

At some point prior to the 2018 election, at a prayer event on the grounds of the local courthouse, Prewitt informed Pastor Bray that, if Burks were to run for the associate circuit judge position, it would cause a rift within the church. Pastor Bray was a friend of Burks' husband. Prewitt provided Pastor Bray with details of Burks' husband's infidelity, noting the husband had broken up marriages in town. Pastor Bray relayed information about Prewitt's comments to Burks' husband. Prewitt, in his testimony before the disciplinary panel, confirmed it was possible he discussed the affairs with Pastor Bray in passing. When Burks learned of the conversation, she was upset Prewitt was interfering with her family's church-related life.

In January 2018, Olinger engaged in a conversation with Prewitt at the insurance office where Olinger was then employed. Prewitt told Olinger that Burks would be his competition and that he did not believe Burks wanted her children to find out about her husband's affairs. Olinger found the substance of the conversation uncomfortable and unprofessional. Olinger relayed the conversation to Burks. Prewitt denies ever talking directly with Olinger at the insurance office.

In mid-January 2018, Burks was in her private law office with Meisner. Meisner told Burks of a conversation he had with James Talt Holman. According to Meisner,

> Prewitt told [Holman] that if [Holman] was going to be talking to anyone that would talk to [Burks] to let them know to let her know that, you know, things were going to come out in this next election that maybe hadn't before and that the election was going to be a blood[]bath.

Per Meisner, the comment about everything coming out and the reference to "bloodbath" were directly from Prewitt.

Holman, a general contractor in concrete excavation in Macon, was also the city's mayor. He discussed Burks' run against Prewitt with Prewitt at sporting events in early 2018. Holman told Prewitt that Burks' children were likely young enough to not know about the affairs when they were occurring and that, beyond potentially being bad politically for Burks, the information could hurt the family if the children learned about the affairs. According to Holman, Prewitt did not ask him to deliver any message to Burks, but Holman thought Burks should know information about the affairs may come out in the campaign. Holman acknowledged having a conversation with Meisner, on his own initiative, without the intention of relaying anything said to Burks. As part of the conversation, Holman stated he told Meisner, "[Y]ou know, that could be bad on her that her kids are going to find out that her husband cheated … on their mother, and I wouldn't think that would be a good thing." Holman acknowledged he may have used the word "bloodbath" in the conversation with Meisner. He equated the term with "political suicide" and attributed its origin to himself, not Prewitt. Prewitt testified that "bloodbath" was not a term he would have used but that he did probably tell Holman that he would not hold back on negative campaign ads in the 2018 election.

Approximately 10 days after her conversation with Meisner, Burks found an anonymous letter in her mailbox addressed to her daughter. The letter crudely described her husband's infidelity and named children of the other families involved in the affairs, indicating those children and others would demand the daughter explain her father's

7

behavior. Burks believed Prewitt was responsible for the letter. She contacted the police. After discussions with the Missouri State Highway Patrol, the FBI became involved. The FBI instructed Burks to meet with Prewitt, and the two met at a Macon restaurant. The FBI provided Burks with a small recording device, and the conversation was recorded.

Throughout the course of the conversation at the restaurant, Prewitt denied knowledge of the letter sent to Burks' daughter, and no evidence exists of Prewitt's involvement with the letter. The conversation became heated. Relevant portions of the exchange are set forth below:

> KRISTEN BURKS: So last night I'm at my office, and I get a message through Todd Holman that you wanted him to communicate with me.
> PHILIP PREWITT: Uh-huh.
> KRISTEN BURKS: Is that a fair statement?
> PHILIP PREWITT: The best I can remember, yeah.
> KRISTEN BURKS: And it came to me that you wanted him to tell me that if I filed against you that huh -- you were going to make me miserable, that it was going to be a blood[]bath.
> PHILIP PREWITT: Like I said, you backed me into a corner.
> KRISTEN BURKS: And then that you were pretty sure my kids didn't know what [my husband] had done and you were going to make sure that they knew; is that a fair statement?
> PHILIP PREWITT: Again, you backed me into a corner.
> ….
> KRISTEN BURKS: My focus is my children; okay? So I need to know, did you tell [Holman] that you were going to make sure that my children knew about [my husband]?
> PHILIP PREWITT: I don't know if I said that, but I did say it was going (inaudible) because you hit me with that fire three days before the election last year (inaudible) full of lies. I'm not going to play nice again this time.
> ….
> PHILIP PREWITT: Look. I understand. I've been prepared for you to run all along. I've been trying to get you to back out because I've been told all the way back last spring that you were running. I've known that for almost a year now. You were running. So, no. I have not been doing anything like [sending a letter]. Now, I don't think you understand just how many people don't like you. I don't think you understand just how ugly this campaign is

8

going to be. If that's what you want for your family, fine, but I didn't send any messages. This is going to be an ugly campaign, and I'm not going to hold back like I did last time, particularly after you hit me with that flier three days before the election. That was bullshit.

KRISTEN BURKS: What do you mean you're not going to hold back? What does that -- what does that --

PHILIP PREWITT: I ran a clean campaign last time. Yes, I'm going to talk about your affair. I'm going to talk about it in the Lincoln dinner speech. I'm going to talk about how you act like you're Hilary Clinton protecting that predator. You brought that predator to Macon County. Yes, I am going to talk about it. I didn't send any letter.

If you don't run, no, I'm not going to talk about it, but if you do, yes, it's going to be everywhere. I'm sending a letter out on it. I'm going to send a [flier] on it to every household in Macon County. You backed me into a corner. You attacked me. You done [sic] the things. Your name has been on complaints that have been filed against me with the ethics commission.

….

PHILIP PREWITT: And, remember, I was the attorney on one of the divorces. I had to sit outside and listen to the divorce on the other one. I know a lot of things. [Your husband] had a lot of (inaudible) talk in four years with those women. I know a lot of things.

KRISTEN BURKS: From [BM]?

PHILIP PREWITT: And --

KRISTEN BURKS: That she told you when you represented her?

PHILIP PREWITT: I know a lot of things over (inaudible) afterward because I didn't know about that during the --

KRISTEN BURKS: And how would she feel about you sharing that information?

PHILIP PREWITT: Do you know how much you all had hurt her? Driven her out of this town? Driven her out of that church? Do you know how you split the Methodist church? You're splitting the Baptist church now with what you're doing. This is not a Godly thing you're doing. I know you think you are. You are splitting and you're going to split the [R]epublican party doing what you're doing.

….

KRISTEN BURKS: I understand that people may not like me, but to involve my children is a different thing.

PHILIP PREWITT: Do you know how much has happened to my kids over at the school?

KRISTEN BURKS: No, I do not.

PHILIP PREWITT: Yes, it does.

KRISTEN BURKS: And I would never do something like that.

PHILIP PREWITT: Well, it does.

KRISTEN BURKS: So why would you subject someone else's children to that, Phil?

PHILIP PREWITT: You have backed me into a corner. I have to rip my kids out of that school and out of this community if I lose this election. You have nothing to lose. You have created this.

KRISTEN BURKS: So do I need to be afraid; is that what you're saying?

PHILIP PREWITT: Afraid of what your husband did and how you protected him?

KRISTEN BURKS: No. It was communicated to me that this would be a blood[]bath.

PHILIP PREWITT: It will be a nasty campaign. It will be. I ran a clean campaign last time. You hit me with a negative ad three days before the election. You did that. I didn't. And it was full. You file against me, next day, that goes down to the ethics commission, that [flier]. The ethics counsel told me they want to look at it.

KRISTEN BURKS: If you thought it was a violation[,] why didn't you just do that anyway?

PHILIP PREWITT: I've been waiting to see what you were going to do, but I don't want to get hit with another negative ad like that full of lies.

KRISTEN BURKS: Well, this has been a waste of time, so. I -- I assumed that you were in control of the situation and that I could have some assurances from you, but if you don't know anything about this letter --

PHILIP PREWITT: You can have assurances that I will stop talking about it --

KRISTEN BURKS: Well --

PHILIP PREWITT: -- but if you are running against me, then it is going to be an issue in the campaign. It will be. It is going to get out. It is going to be widespread, because I'm going to make sure it is. You go run against [the prosecutor]. You go run against [the circuit judge]. Leave me alone. But those are the issues that I have to run on, and those are the issues that I am going to run on. Why do you want to run against me? I don't know.

In March 2018, Burks submitted a complaint to the Judicial Commission outlining the statements made by Prewitt during their encounter. Burks also contacted BM to inform her she was referenced in the conversation, particularly in regard to Prewitt's previous legal representation of her. After notification from Burks about the conversation with Prewitt at the restaurant, BM contacted Prewitt. She expressed concern that he had been her attorney

and that she did not want information about the affair scattered around town. Unsatisfied with the outcome of their conversation, BM wrote a letter to the Judicial Commission.

At the disciplinary hearing, Burks expressed her concern that Prewitt would publicly label her husband a "predator." Burks provided her understanding of "predator": "someone who seeks out prey, who looks for innocent people and takes advantage of them sexually or financially." Her husband's affairs were consensual with adult women over whom he held no power. Prewitt agreed "predator" could be taken to mean sexual predator, but he defined the word as "[s]omebody who hunts somebody else." One of Prewitt's witnesses commented that her observation of the husband's conduct was not predatory but flirtatious.

Burks entered the 2018 election as an Independent candidate. She won the election and took office in January 2019. Prewitt did not follow through on publishing advertisements detailing the affairs of Burks' husband or publicly stating Burks was supporting a predator. Prewitt could not unequivocally say he did not ever bring up the topic of Burks' husband's infidelity himself. He testified, "It was very surprising to a vast number of people given that she would be putting herself in the public eye." He admitted one of the reasons he did not disseminate campaign information discussing the affairs was due to the complaint pending with the Judicial Commission.

*A. Threats Pertaining to Candidate Burks*

OCDC argues Prewitt violated Rules 2-1.2, 2-1.3, and 4-8.4(d) when he threatened Burks, a potential judicial opponent, as a means to keep her from campaigning against him. Rule 2-1.2 provides, "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid

11

impropriety and the appearance of impropriety." Rule 2-1.3 states, "A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so." Rule 4-8.4(d) provides it is professional misconduct to "engage in conduct that is prejudicial to the administration of justice."

Prewitt's briefing acknowledges he "sought to dissuade [Burks] running for the office he held." In accord with the panel, this Court finds Prewitt was doing more than warning his political opponent about topics that could emerge during the course of the campaign. Rather, Prewitt was attempting to coerce Burks into not running against him. First, he threatened that Burks' filing would result in him filing an ethics complaint against her based on the previous campaign. Second, he threatened to give speeches and send out fliers in which he would call her husband a "predator." Intertwined in this threat was Prewitt's intention of making a point that Burks' children, who were unaware of the affair, would be certain to learn of it.

A judge's threat to file an ethics complaint against a lawyer, if and only if that lawyer decides to oppose him in an election, is impermissible. Under Rule 2-2.15(B), "A judge having knowledge that a lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question regarding the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects shall inform the appropriate disciplinary authority." The same obligation exists for all lawyers. Rule 4-8.3(a). Prewitt threatened Burks he would file an ethics complaint if she decided to run. Prewitt's intention to file the complaint showed either (1) he believed Burks' prior campaign information violated the Rules or (2) he meant to harass her with a complaint that did not rise to a Rules

violation. If Prewitt believed the prior campaign material warranted reporting, under Rules 2-2.15(B) and 4-8.3(a), he had an obligation to file the complaint. Yet he held it in abeyance. Although Prewitt has not been charged with and this Court does not find a Rule 2-2.15(B) or Rule 4-8.3(a) violation, Prewitt's misuse of those directives in this context violates Rules 2-1.2, 2-1.3, and 4-8.4(d). A judge's threat to file a required ethics complaint, at his discretion and for his benefit, destroys public confidence in the independence, integrity, and impartiality of the judiciary; is an abuse of the prestige of judicial office for personal benefit; and is prejudicial to the administration of justice.

In his testimony before the panel, Prewitt refused to characterize as threats the prospect of sending out a flier labeling Burks' husband as a "predator" and making known the information concerning the affairs. Prewitt believed Burks' husband's affairs to be relevant to Burks' campaign because, if elected, Burks would oversee divorce cases and exercise her discretion in those cases. Even if this background information were relevant, a position merely assumed here, no legitimate purpose, other than to convince Burks to back out of the contest, can be discerned from Prewitt's threat to ensure Burks' children found out about the affairs. Prewitt responded he was "backed … into a corner" when Burks questioned whether he stated he would make sure her kids found out about their father's extramarital relationships. Prewitt also did not deny characterizing the upcoming campaign as a "bloodbath."

Prewitt argues imposition of discipline based upon the communications he made to Burks violates his constitutional free speech rights. Because this Court already found Prewitt's promise to forego filing an ethics complaint in exchange for Burks not pursuing

13

the campaign to violate Rules 2-1.2, 2-1.3, and 4-8.4(d)—i.e., all of the Rule violations alleged in Count II related to general threats—it declines to enter into an analysis of whether the additional statements made to Burks, in the context of a political campaign, were permissible under the First Amendment.

### B. Threat to Reveal Client Information

OCDC argues Prewitt violated Rules 2-1.2, 2-1.3, 4-1.9(c), and 4-8.4(a) when he threatened to disclose a former client's confidences as a means of helping his campaign. These rule violations turn on the violation of Rule 4-1.9(c), which provides,

> A lawyer who has formerly represented a client in a matter … shall not thereafter:
> (1) use information relating to the representation to the disadvantage of the former client *except* as these Rules would permit or require with respect to a client or *when the information has become generally known*; or
> (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

(Emphasis added). Rule 4-8.4(a) states that "attempt[ing] to violate the Rules of Professional Conduct" is professional misconduct. The text of Rules 2-1.2 and 2-1.3 is set out in the prior section.

Prewitt's initial counterargument is that the information was generally known; therefore, its disclosure would fall within the exception in Rule 4-1.9(c)(1). After a review of the record, this Court disagrees. Both parties cite to a 2017 ABA formal opinion suggesting that information is "generally known" when widely recognized by members of the public in the relevant geographical area. *See* ABA Comm. on Ethics & Pro. Resp., Formal Op. 479 (2017).

The extent of knowledge of the affair between Burks' husband and BM is of relevance here. BM testified at Prewitt's disciplinary hearing. Prewitt represented BM in her divorce, which was filed in 2009. BM testified she told a handful of friends about the affair but that "[n]ot everyone" in town or in Macon County knew about it. Several of OCDC's witnesses answered questions about the extent of knowledge of the affairs. Pastor Bray was aware Burks' husband had an affair before Prewitt approached him with the information. He learned of the information from his duties as a pastor, but he acknowledged he had also heard about it through the community. Olinger, the former police chief, did not hear the affairs discussed in 2018 by anyone other than Prewitt. He did not know about the affairs. In his experience as police chief, the affairs were not generally known in the community, although he admitted it would have been easily possible that others would have known about an affair even though he did not. Holman learned of the affairs sometime between 2013 to 2015. AL, one of the women with whom Burks' husband had an affair, was the wife of a friend of Holman. Holman learned of the affair "just in passing around town" and confirmed it with his friend. He testified the affairs were not widely known in the Macon County community at first but "it got a little louder as the divorce [of BM] . . . started to take hold." Meisner was aware Burks' husband had one affair—the affair with AL. At some point before the 2014 election, Burks told Meisner her husband had been unfaithful. Meisner did not learn of the second affair—the affair with BM—until counsel for Prewitt took his deposition in this matter. According to Meisner, no one in the community was discussing the affairs.

Prewitt's witnesses also responded to questions about whether BM's affair was generally known. Prewitt called State Senator Cynthia O'Laughlin as a witness. Senator O'Laughlin, who owns a business in Macon with her husband, testified she superficially followed the campaign between Prewitt and Burks. She further testified that the rumor of the affair of Burks' husband was "out there" and that "[i]t was pretty widespread." She stated she first learned of the affair in spring 2018, at the start of the campaign, from Burks' campaign consultant, who inquired whether she had heard about it. She told the consultant she had no knowledge of such a thing. The names of the women were never mentioned.

Derek Bond was a physical therapist who had worked in Macon County for 20 years. Patients at Bond's facility were often together and sometimes engaged in group discussions, including discussing politics. Bond testified he learned of Burks' husband's affairs as they were being talked about at the local YMCA in 2010 or 2011. He stated the topic was discussed in his facility when Burks started running for office. According to Bond, "it seemed that most people were aware" of the affairs.

Brenda Alexis Jacoby, the manager of Spin City Laundry, Macon County's sole laundromat, frequently conversed with clients as they washed and dried their clothes. Jacoby testified she heard rumors of infidelity involving the Burkses. She further testified she learned of a fight at the YMCA between Burks' husband and AL's former husband in 2012. At this point, she learned there was another affair but did not learn of the name of the other woman. At a subsequent point, she heard the name of the woman in the other affair, BM, in passing at the laundromat. Jacoby testified she never heard anyone discuss the affairs at the YMCA. The topic was heard only in the laundromat and in her personal

16

life. She stated, "My circle is pretty small." She considered her circle to be around 50 people.

Prewitt also called Jane Thompson as a witness.[5] Thompson, a resident of Macon, owned Spin City Laundry and commercial rental properties. Thompson first learned of Burks' husband having affairs from the person who maintained her yard. The discussion occurred when Burks ran in 2014. According to Thompson, this person "knows everyone in town and what's happening." Thompson also heard news of the affair from a woman in her 80s on the Macon County Republican Central Committee. Thompson believed the information was well known in the community because she and this other woman knew about it and neither were contemporaries of the Burkses.

While allowing that salacious details may travel quickly in a small town, as was often referenced in testimony, this Court does not find the information that BM engaged in an affair with Burks' husband was generally known. It may be that rumors of an affair were generally known, and it could be the case that the affair with AL was generally known, but this Court finds from the record that the affair with BM was not generally known. The information was not widely recognized by members of the public in the relevant geographical area. Prewitt's briefing states BM's testimony established the information was generally known, but her testimony did not go so far. Moreover, Meisner, a close acquaintance of Burks, was unaware. Olinger, a figure who would have been in the position to hear community happenings, was unaware before Prewitt told him. Although

---

[5] Thompson, who served as the campaign manager for Prewitt's campaign, also provided testimony relevant to the MEC count that is no longer before this Court.

17

a few individuals who were in particular positions to expose themselves to gossip, whether due to their professions or civic engagement, may have been aware of rumors of the affair with BM, such isolated circumstances do not establish the information was generally known.

Prewitt also argues he did not obtain the information he said he would disclose in the course of representing BM. BM's and Prewitt's testimony diverged greatly on this topic. The panel specifically found BM's testimony credible, and, in the context of the overall record, this Court agrees with that assessment. According to BM, she informed Prewitt she was having an affair with Burks' husband in their initial meeting. She did so because of fear of her then-husband. After her divorce was final, BM's relationship with Prewitt changed: she became good friends with Prewitt's then-wife and began socializing with the couple. During their frequent social engagements, she testified, Prewitt would often ask about the Burkses, seeking a variety of information about Burks and her husband.

Prewitt testified he did not normally handle divorces in his practice, but he accepted BM's case because she explained she wanted it done quickly and she and her husband were in agreement. According to Prewitt, BM did not mention anything about having an affair. He was adamant he did not learn about the affair until December 2012 at a birthday party, and he then understood why BM would not let him conduct discovery when her then-husband hired an attorney. He further stated he would not have taken a complicated divorce case because it would have been outside his area of expertise. Following the conclusion of the divorce, Prewitt disputed questioning BM about Burks and her husband during their

social engagements, stating it did not fit the timeline of when he learned of the affair and when he became aware Burks may be running against him.

Weighing against Prewitt's account of learning of BM's affair outside of representation, beyond BM's testimony, is the manner in which he raised the issue at the meeting with Burks: "And, remember, I was the attorney on one of the divorces." Raising the issue that he was the attorney in the divorce creates no other inference than that he learned of relevant information pertaining to BM that could be used against Burks' husband, to the disadvantage of BM, his former client. Even if Prewitt discovered additional details of BM's affair afterwards, in the course of their social engagements, use of these details would still have "relat[ed] to the representation" of BM and would have violated Rule 4-1.9(c).

Use of information from the representation would have been to the disadvantage of BM. She testified she did not want the personal information broadcasted. Having found that the information was not generally known, no other exception in the Rules would have permitted the use of information relating to the representation of BM to her disadvantage. By threatening to reveal the confidential information, Prewitt violated Rules 4-1.9(c) and 4-8.4(a). As a result of these violations, Prewitt also violated Rules 2-1.2 and 2-1.3.[6]

---

[6] OCDC also seeks discipline based on Prewitt's impromptu speech at an ice cream social for the local Republican Committee. The speech was recorded by Burks and transcribed. According to OCDC, Prewitt made comments concerning his prior judicial discipline that misrepresented the truth and showed a lack of respect for this Court and the Judicial Commission's authority to bring disciplinary charges against him. Prewitt also made a statement about the need to keep his party in the courthouse. OCDC argues Prewitt's endorsement of the Republican party created the perception he might give preferential treatment to Republicans who appeared before him. After reviewing the transcript of the

## Analysis of Appropriate Discipline

Having determined Prewitt violated Rules 2-1.2, 2-1.3, 4-1.9(c), 4-8.4(a), and 4-8.4(d), the next step this Court must undertake is to determine the appropriate discipline. As explained in *In re Kazanas*:

> The purpose of discipline is not to punish the attorney, but to protect the public and maintain the integrity of the legal profession. Those twin purposes may be achieved both directly, by removing a person from the practice of law, and indirectly, by imposing a sanction which serves to deter other members of the Bar from engaging in similar conduct.

96 S.W.3d 803, 807-08 (Mo. banc 2003).

In addition to the ethical duty violated, this Court looks to "the attorney's mental state, the extent of actual or potential injury caused by the attorney's misconduct, and any aggravating or mitigating factors." *In re McMillin*, 521 S.W.3d 604, 610 (Mo. banc 2017); *see also* American Bar Association's Standards for Imposing Lawyer Sanctions 3.0 (1992) ("ABA Standards"). "When this Court finds an attorney has committed multiple acts of misconduct, the ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among the violations." *McMillin*, 521 S.W.3d at 610.

ABA Standard 5.2 generally provides a framework for discipline for failure to maintain the public trust. OCDC contends Prewitt's conduct falls under ABA Standard

---

short, unscripted, and rushed campaign speech, this Court declines to find Rule violations. Consequently, addressing Prewitt's argument that his campaign speech was protected by the First Amendment is unnecessary.

20

5.22: "Suspension is generally appropriate when a lawyer in an official or governmental position knowingly fails to follow proper procedures or rules, and causes injury or potential injury to a party or to the integrity of the legal process." Prewitt counters that, should this Court find misconduct, ABA Standard 5.23 or 5.24 should control. ABA Standard 5.23 involves a negligent failure on behalf of the lawyer and results in a suggested reprimand. ABA Standard 5.24 suggests an "[a]dmonition is generally appropriate when a lawyer in an official or governmental position engages in an isolated instance of negligence in not following proper procedures or rules, and causes little or no actual or potential injury to a party or to the integrity of the legal process."

Prewitt's invocation of ABA Standards 5.23 and 5.24 is not appropriate. His acts of misconduct were not negligent. Prewitt knew attempting to coerce Burks through the threat of filing the ethics complaint was not acceptable for a lawyer or a judge. He knew revealing confidential information regarding a former client was impermissible. His actions caused potential injury to his former client and the legal system. Under the ABA Standards, suspension is the appropriate discipline.

Against the presumptive discipline of suspension, aggravating and mitigating circumstances must be considered. *See In re Belz*, 258 S.W.3d 38, 42-44 (Mo. banc 2008). In aggravation, Prewitt has prior disciplinary history. *See* ABA Standard 9.22(a). Part of that discipline involved a threat by Prewitt to become involved in the circuit clerk's campaign if she did not remove his opponent's signs from her yard. This similar misconduct suggests an unwillingness by Prewitt to recognize and alter his behavior. Prewitt was acting with a selfish motive, attempting to retain his position by any means.

21

*See* ABA Standard 9.22(b). Prewitt refused to acknowledge any wrongdoing. *See* ABA Standard 9.22(g). Prewitt has substantial experience with the law. *See* ABA Standard 9.22(i). As relevant to the misconduct found by this Court, Prewitt offers in mitigation only that he cooperated with OCDC during the disciplinary process. *See* ABA Standard 9.32(e). When mitigating and aggravating factors are weighed, the presumptive discipline of a suspension is not ameliorated. The abundance of factors in aggravation, in combination with the seriousness of the Rules violated and that the wrongdoer was a judge at the time of the transgressions, further moves this Court to impose a suspension.

## Conclusion

For the foregoing reasons, this Court orders Prewitt be suspended indefinitely with no leave to apply for reinstatement for two years.

_____
Robin Ransom, Judge

All concur.